# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **GEOFFREY CALHOUN, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:09-CV-3286-TCB** |
| | ) | |
| **RICHARD PENNINGTON, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' REPORT TO COURT RE CITIZEN COMPLAINT SANCTIONS

Thomas E. Reilly, GA Bar No. 600195
tom.reilly@troutman.com
Tiffany N. Bracewell, GA Bar No. 377084
tiffany.bracewell@troutman.com
**Troutman Pepper Hamilton Sanders LLP**
600 Peachtree Street, NE, Suite 3000
Atlanta, GA 30308
Tel: 404.885.3000
Fax: 404.885.3900

*Counsel for Defendant City of Atlanta*

# **TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ................................................................................................1

ARGUMENT AND CITATIONS TO AUTHORITY .............................................4

I.    RELEVANT LEGAL STANDARDS ....................................................4

    A.    Procedural Posture.............................................................4

    B.    The Contours of Civil Contempt ........................................7

    C.    The City Is Overcoming Historical Barriers to Compliance and Has Implemented Significant Remedial Measures Since June 2023 ................................................................................10

        1.    Lack of Communication and Understanding of Court-Ordered Requirements Led In Part to Inaccurate Tracking and Reporting ..............................................10

            a.    Inaccurate Open Dates ...................................12

            b.    Inaccurate Close Dates ..................................12

            c.    Other Inaccuracies in Monthly Reporting .....................13

            d.    Inaccuracies in Notification Letter Content ..................16

        2.    The City Recently Implemented a Series of Remedial Measures with Measurable Positive Effects on Tracking Timely Complaint Resolution and Accurate Reporting ..........16

            a.    Improved Communication and Internal Training..........17

            b.    Process Improvements ...................................18

            c.    Dedicated Lieutenant Resource and Retention of Outside Counsel for Review ...........................................20

            d.    Prioritization of Resolving Issues Identified by Plaintiffs.........................................................................21

            e.    Current State of Compliance with 180-Day Rule ..........21

II.    PROPOSED MONETARY SANCTIONS AND SPECIFIC OBJECTIONS TO EXHIBITS.................................................................................22

    A.    The Proposed Sanctions Are Not Proportional to the Noncompliance and Do Not Advance Calhoun's Reform Goals .......22

i

1. Statistics Regarding Outstanding Complaints by Year ............22

2. Status of Compliance with Other Elements of the 2018 Order .........................................................................23

    a. Training.................................................................24

    b. Stop and Think Forms ...................................24

    c. Identification Requirement ...........................25

    d. Standard Operating Procedures ("SOPs").....................25

B. The City's Lesser Proposed Sanctions Ensure Compliance ..............26

1. Option One: Redirection of Sanctions Payment to Dedicated Calhoun Compliance Resources...........................27

2. Option Two: $1.142 million to $1.742 million under a Cap Rubric, Combined with Elimination of Duplicated Sanctions and Other Minor Downward Adjustments...............29

3. Option Three: Reduced Sanctions Due to Errors in Plaintiffs' Exhibits and Data Duplication.................................31

C. Plaintiffs' "Recommendation for Remedial Order in Lieu of Additional Financial Sanctions" Seeks Unnecessary and Inappropriate Modifications to the 2018 Order ..................................32

1. Standard of Review.................................................................32

2. The City Consents to Use of Trackable Mail ...........................34

3. Inclusion of Plaintiffs' Counsel in E-mail Communications to Complainants Exceeds the Scope of the 2018 Order and Impacts Complainants' Privacy Rights .........................................................................35

4. Required Reporting of Policy, Directive, Rule, or Regulation Violations Below the Work Rule Level Is Unduly Burdensome at This Time, But the City Already Has Made Efforts to Cite Such Information in Notification Letters ................................................................36

5. Plaintiffs' Request for an Extension is Both Premature and Unwarranted Given the City's Substantial Compliance with the 2018 and March 2023 Orders as a Whole .......................................................................40

CONCLUSION .......................................................................................................44

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acosta v. Jasper Contractors, Inc.*,
  16-CV-3845, 2017 WL 8186721 (N.D. Ga. July 24, 2017)...............................30

*Barnett v. Sheriff of Broward Cty.*,
  No. 20-61113-CIV, 2023 U.S. Dist. LEXIS 87333 (S.D. Fla. May
  18, 2023) ............................................................................5, 6, 11, 44

*Barnett v. Tony*,
  No. 20-cv-61113, 2023 U.S. Dist. LEXIS 141650 (S.D. Fla. Aug.
  11, 2023) ...........................................................................................6, 41

*Chairs v. Burgess*,
  143 F.3d 1432 (11th Cir. 1998) ............................................................5

*Citronelle-Mobile Gathering, Inc. v. Watkins*,
  943 F.2d 1297 (11th Cir. 1991) ............................................................8

*Diamond Resorts Int'l, Inc. v. United States Consumer Attorneys, P.A.*,
  No. 18-80311-CIV, 2021 U.S. Dist. LEXIS 261939 (S.D. Fla. Apr.
  9, 2021) .............................................................................................8, 9

*E.E.O.C. v. Guardian Pools, Inc.*,
  828 F.2d 1507 (11th Cir. 1987) ......................................................7, 8

*Forry v. Federated Fin. Servs.*,
  No. 01-7089-CIV, 2007 U.S. Dist. LEXIS 105266 (S.D. Fla. Dec.
  5, 2007) ...........................................................................................41

*Holland v. N.J. Dep't of Corr.*,
  246 F.3d 267 (3d Cir. 2001) ...............................................33, 34, 42

*Jacksonville Branch, N.A.A.C.P. v. Duval Cnty. Sch. Bd.*,
  978 F.2d 1574 (11th Cir. 1992) ..........................................32, 42

*Konst v. Fla. E. Coast Ry. Co.*,
  71 F.3d 850 (11th Cir. 1996) ............................................................34

*Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*,
478 U.S. 421 (1986)......................................................................7, 28

*In re McLean*,
794 F.3d 1313 (11th Cir. 2015) ........................................7, 10, 23, 27

*Mercer v. Mitchell*,
908 F.2d 763 (11th Cir. 1990) ...........................................4, 5, 6, 23

*Nat'l Union Fire Ins. Co. v. Olympia Holding Corp.*,
140 F. App'x 860 (11th Cir. 2005) .....................................................7

*Newman v. Graddick*,
740 F.2d 1513 (11th Cir. 1984) ..........................................................5

*Peery v. City of Miami*,
977 F.3d 1061 (11th Cir. 2020) ...........................................4, 6, 9, 43

*PlayNation Play Sys. v. Velex Corp.*,
939 F.3d 1205 (11th Cir. 2019) .........................................................5

*Reynolds v. McInnes*,
338 F.3d 1221 (11th Cir. 2003) ...................................1, 7, 32, 33, 43

*Rufo v. Inmates of Suffolk Cty. Jail*,
502 U.S. 367 (1992)...........................................................33, 37, 40

*Sierra Club v. Meiburg*,
296 F.3d 1021 (11th Cir. 2002) .......................................................32

*Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*,
793 F.2d 1529 (11th Cir. 1986) ............................................9, 10, 26

*Thompson v. United States HUD*,
404 F.3d 821 (4th Cir. 2005) ...........................................................41

*United States v. Boursiquot*,
No. 17-60550-Civ, 2021 U.S. Dist. LEXIS 101289 (S.D. Fla. May
27, 2021) .........................................................................................10

*United States v. City of Fort Pierce*,
No. 08-14309-CIV, 2011 U.S. Dist. LEXIS 163401 (S.D. Fla. July
11, 2011) .........................................................................................41

v

*United States v. City of Miami*,
   195 F.3d 1292 (11th Cir. 1999) ............................................................................7

*United States v. Rizzo*,
   539 F.2d 458 (5th Cir. 1976) .........................................................................9, 10

Defendant City of Atlanta (the "City") hereby files this response to Plaintiffs' Report to Court Re Citizen Complaint Sanctions ("Plaintiffs' Report") (Doc. 515), showing the Court as follows:

## **INTRODUCTION**

As the Court is aware, this case stems from the warrantless raid of the Atlanta Eagle nearly fifteen years ago and the illegal search and mistreatment of Eagle patrons. Plaintiffs' counsel understandably carried many demands in filing suit against the City: that the Atlanta Police Department ("APD" or the "Department") conduct a comprehensive investigation into the Eagle raid, overhaul its policies, undergo new training concerning fundamental constitutional principles, and ensure accountability to the citizenry through several different measures, including uniform identification requirements and responsiveness to citizen complaints, among others. (*See* Doc. 265-1.)

"Complex consent decrees in institutional reform cases, like much in life, are a series of experiments[.]" *Reynolds v. McInnes*, 338 F.3d 1221, 1230 (11th Cir. 2003). Indeed, during several years of litigation and difficult settlement negotiations, the parties' priorities have shifted, and their resolutions and the Court's instructions have evolved and been clarified. (*See* Docs. 265-1, 269, 280, 289, 401, 434.) The reforms implemented have benefited APD, the City, and its residents. But the roughly $5 to $9 million sanctions proposed by Plaintiffs (Doc. 515 at 51)—

mostly attributable to miscommunications and paperwork errors, untethered to this lawsuit's genesis and fundamental purpose, and arising from *one* aspect of the parties' series of expansive agreements and associated Court orders—seek to dramatically reallocate resources from the very Department and processes Plaintiffs complain about and want changed.[1]  The sanctions proposed neither coerce more compliance from the City nor promote *Calhoun*'s broader objectives.

That said, the City acknowledges that despite its efforts it unfortunately has not complied with all terms of the Court's 2018 Order (Doc. 434) or March 2023 Order (Doc. 492).  Though unintentional, the City regrets the errors APD has made in connection with the 87 unique citizen complaints detailed in Plaintiffs' Report and Exhibits and potentially others.[2]  In most cases, the errors are not legally excusable and there is no good explanation for them.  The lack of communication between stakeholders and APD's misunderstanding of the Court's orders over many years are indefensible.[3]  Accordingly, except as outlined below in Section II and

---

[1] *See* Declaration of Chief of Police Darin Schierbaum, attached hereto as Exhibit C, ¶ 11, and Declaration of Chief Financial Officer Mohamed Balla, attached hereto as Exhibit D, ¶ 5.

[2] *See* "Table of Sanction Totals by Unique Complaint," attached hereto as Ex. F-1, which extracts and lists in one place the unique complaints identified across Plaintiffs' twenty-one exhibits, as well as the total sanctions Plaintiffs attribute to each for alleged violation(s) of the Court's 2018 or March 2023 Orders.

[3] As discussed in greater detail in Exhibit C, as well as the Declaration of Major Carlo Peek, Commander of APD's Office of Professional Standards ("OPS"), attached hereto as Exhibit A, the Department has experienced frequent turnover in

corresponding exhibits, the City does not contest the deficiencies identified in Plaintiffs' Exhibits G, H, I, J, M, N, O, P, and S.[4]  The City also does not dispute that Plaintiffs' methodology for calculating sanctions generally aligns with the Court's March 2023 Order (Doc. 492).

The City respectfully requests, however, that this Court consider the information and evidence provided herein, including: (1) the City has in good faith substantially complied with the 2018 Order and March 2023 Order taken as a whole; (2) significant measures implemented by the City since approximately June 2023 that have put it on the right compliance trajectory; and (3) the impact of the proposed sanctions (exclusive of attorneys' fees) on the already under-resourced and under-staffed City departments and personnel responsible for complying with the requirements set forth in this Court's orders.  Finally, the City asks the Court to evaluate its counterproposals for alternative monetary sanctions and the City's agreement to certain non-monetary measures, which are made in continued good

_____

leadership and key personnel during the last three years that inhibited continuity in compliance and contributed to these misunderstandings.  *See* Ex. A, ¶¶ 7, 8, 38; Ex. C, ¶ 4.

[4] The City purposefully has excluded Plaintiffs' Exhibits A, B, C, D, and E (which roll up information presented in Exhibits G, H, I, J, M, N, O, and P); Exhibits F and L (which present cases of "timely and compliant notification"); Exhibits K and Q (Plaintiffs' alternative proposal of treating notifications that lacked discipline as "closed" versus "open," as presented in Exhibits J and P); and Exhibit R (Plaintiffs' annotated version of the City's May 15, 2023 report of complaints closed in April, which is then summarized with sanctions calculations in Exhibit S).

faith and with a commitment to continuing to improve compliance with the Court's orders and enhance the relevant systems and processes.

## ARGUMENT AND CITATIONS TO AUTHORITY

## I.    RELEVANT LEGAL STANDARDS

### A.    Procedural Posture

"Although a district court has a certain amount of discretion in . . . the procedure by which [civil contempt] sanctions are imposed, the court must stay within the bounds of due process." *Mercer v. Mitchell*, 908 F.2d 763, 766 (11th Cir. 1990). Accordingly, due process requires "[the] party seeking an order holding the defendant in contempt for violating the consent decree [to] 'move[] the court to issue an order to show cause why the defendant should not be adjudged in civil contempt and sanctioned.'" *Peery v. City of Miami*, 977 F.3d 1061, 1076 (11th Cir. 2020) (internal quotation and citation omitted). Before the court grants this show-cause order, the movant "must first establish by clear and convincing evidence that the alleged contemnor violated a court's earlier order." *Id.* (internal quotation and citation omitted). Specifically, the movant must establish by clear and convincing evidence that: "(1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." *Id.* (internal quotation and citation omitted). Any ambiguities must be construed in favor of the alleged contemnor. *See id.*

4

If the moving party satisfies its threshold burden, at the show-cause hearing the contemnor is "allowed to show either that he did not violate the court order or that he was excused from complying." *Mercer*, 908 F.2d at 768. "A contemnor may be excused because of an 'inability' to comply with the terms of the order." *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998). "'Inability,' as a defense to contempt, does not mean that compliance must be totally impossible. Instead, the inability that will absolve a party from being held in contempt requires only that the noncomplying party has made in good faith all reasonable efforts to comply with the terms of a court order." *Id.* at 1437-38 (vacating district court's contempt order and remanding for the district court to consider all of defendant's proffered evidence of its inability to comply, including evidence that defendant was subject to a large number of orders, which defendant argued it would be forced to violate if it complied with all terms of the consent decree at issue) (internal quotation and citation omitted); *see also PlayNation Play Sys. v. Velex Corp.*, 939 F.3d 1205, 1213 (11th Cir. 2019) ("[S]ubstantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance.") (internal quotation and citation omitted); *Newman v. Graddick*, 740 F.2d 1513, 1525 (11th Cir. 1984) ("[A] person who attempts with reasonable diligence to comply with a court order should not be held in contempt."); *Barnett v. Sheriff of Broward Cty.*, No. 20-61113-CIV, 2023 U.S. Dist. LEXIS 87333, at *8 (S.D. Fla. May 18, 2023)

5

(finding that defendant should not be held in contempt based on testimonial evidence and exhibits presented at the show-cause hearing "that at least partially rebutted Plaintiffs' claims and established that Defendant was in substantial compliance," including testimony that understaffing from a nationwide nursing shortage contributed to defendant's inability to comply with its obligation to test all detainees), *adopted by Barnett v. Tony*, No. 20-cv-61113, 2023 U.S. Dist. LEXIS 141650, at *7-9 (S.D. Fla. Aug. 11, 2023).

"[W]hen there are no disputed factual matters that require an evidentiary hearing, the court might properly dispense with the hearing prior to finding the defendant in contempt and sanctioning him.  This principle, however, implies its converse.  If the court *is* faced with a material issue of fact, then due process requires the court to conduct a hearing."  *Mercer*, 908 F.2d at 769 n.11 (emphasis in original) (holding that the court's imposition of a $36,000 fine that was not preceded by a show-cause order or hearing "ignored the due process requirement that a hearing be conducted on all issues of material fact and imposed what amounted to a punitive, or criminal, contempt sanction," because when defendant asserted that it had diligently attempted to comply with the court's order, defendant "put into issue a

material fact (in addition to the ever-present question whether circumstances had changed in a way that would make finding the defendant in contempt unjust)").[5]

If the plaintiffs prove what they have alleged in their motion and the defendants have their opportunity to respond, "the court [then] must determine whether the defendants have complied with the provision at issue and, if not, decide what sanctions are necessary to ensure compliance." *Reynolds*, 338 F.3d at 1208.

## B.    The Contours of Civil Contempt

Civil contempt sanctions "may be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421, 442-44 (1986) (internal quotation and citation omitted). "The district court has wide discretion to fashion an equitable remedy for contempt that is appropriate to the circumstances." *E.E.O.C. v. Guardian Pools, Inc.*, 828 F.2d 1507, 1515 (11th Cir. 1987); *see also, e.g., Nat'l Union Fire Ins. Co. v. Olympia Holding Corp.*, 140 F. App'x 860, 864 (11th Cir. 2005) ("Once a district court finds a party in contempt, it has 'broad discretion in fashioning a contempt sanction.'") (internal quotation and citation omitted). Nevertheless, coercive

---

[5] *See also Peery*, 977 F.3d at 1076 (analyzing plaintiffs' contempt motion through the lens of the due process requirement of a show-cause order, even though plaintiffs did not specifically ask the district court to issue one, and stating: "[T]he district court must apply the procedures for evaluating civil contempt, regardless of whether either party explicitly requests them.").

sanctions "cannot be any greater than necessary to ensure [] compliance and may not be so excessive as to be punitive in nature." *In re McLean*, 794 F.3d 1313, 1323 (11th Cir. 2015) (internal quotation and citation omitted); *see also United States v. City of Miami*, 195 F.3d 1292, 1300-02 (11th Cir. 1999) (holding that the district court abused its discretion by awarding "overly broad" civil contempt sanctions in the form of "make-whole" relief for the entire class of a class action suit stemming from racially discriminatory promotional practices that "so exceed[ed] the monetary value of the lost promotions that [the court could] only interpret the award as punitive in nature.").

"When fashioning a sanction to secure compliance, a district court should consider the character and magnitude of the harm threatened by continued contumacy and the probable effectiveness of any suggested sanction in bringing about the result desired." *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1304 (11th Cir. 1991) (internal quotation and citation omitted). "[T]he court should also consider the financial resources of the defendant, and the resulting burden to the defendant." *Guardian Pools*, 828 F.2d at 1515; *see also Diamond Resorts Int'l, Inc. v. United States Consumer Attorneys, P.A.*, No. 18-80311-CIV, 2021 U.S. Dist. LEXIS 261939, at *42 (S.D. Fla. Apr. 9, 2021) (imposing coercive sanctions in an amount "sufficient and not greater than necessary to coerce

compliance" based on one defendant's testimony regarding the financial condition of all defendants).

"The willfulness of the alleged contemnor"—while not a prerequisite to a finding of civil contempt—nevertheless "may factor into a court's considerations in other ways. . . . '[F]or example, . . . a party's good faith, even where it does not bar civil contempt, may help to determine an appropriate sanction.'" *Diamond Resorts Int'l*, 2021 U.S. Dist. LEXIS 261939, at *10 (quoting *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019)).

Courts also consider the proportionality of noncompliance in the context of the relevant compliance program as a whole. *See, e.g.*, *Peery*, 977 F.3d at 1075, 1077 (affirming district court's denial of civil contempt motion and termination of consent decree where the court, "measur[ing] compliance in terms of substantial performance," found the City of Miami to be in compliance with the decree's requirements); *see also United States v. Rizzo*, 539 F.2d 458, 466 (5th Cir. 1976) (reversing a civil contempt order and holding the defendant rebutted any presumption that he was able but unwilling to produce information on less than 200 patients when more than 15,000 such records were maintained and it was inevitable that some were misplaced due to the nature of the defendant's filing system).

Further, the court "retains inherent power to waive the sanction in a particular case" and is not required to penalize every violation included in a prospective fine

schedule.  *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1537 (11th Cir. 1986).  Indeed, it is within the Court's discretion to rescind prospective sanctions entirely if, now or in the future, the City satisfies the Court that it is acting with the appropriate diligence in its compliance efforts.  *See Sizzler Family Steak Houses*, 793 F.2d at 1537; *see also In re McLean*, 794 F.3d at 1324 (vacating non-compensatory sanctions); *Rizzo*, 539 F.2d at 463 ("[A] judgment of civil contempt is conditional, and may be lifted if the contemnor purges himself of the contempt, while punishment for criminal contempt is unconditional."); *United States v. Boursiquot*, No. 17-60550-Civ, 2021 U.S. Dist. LEXIS 101289, at *9 (S.D. Fla. May 27, 2021) (rejecting magistrate judge's recommendation to impose a $2,000 fine for defendant's "contemptuous conduct, and to deter him from further contemptuous conduct" as a punitive sanction for which defendant had not received "the necessary due process," where there was no evidence that defendant was currently in violation of the permanent injunction and thus in need of a coercive fee).

### C.   The City Is Overcoming Historical Barriers to Compliance and Has Implemented Significant Remedial Measures Since June 2023

#### 1.   Lack of Communication and Understanding of Court-Ordered Requirements Led In Part to Inaccurate Tracking and Reporting

Lack of communication, exacerbated by turnover in key positions in APD and OPS, contributed to the issues identified by Plaintiffs' motions (*see* Docs. 473, 475) and Plaintiffs' Report (Doc. 515) with respect to the timely resolution of and

accurate reporting about citizen complaints.  The City regrets such breakdowns and acknowledges that they should not have happened and cannot persist.

Despite these breakdowns, the City unequivocally agrees that allegations of employee misconduct should be investigated methodically and thoughtfully, and APD has done so.  Its process is rigorous.[6]  Though not every investigation has been timely completed or accurately reported, Plaintiffs have made no systematic allegations that APD's handling of its investigations is superficial or substandard or that the discipline APD imposes is manifestly wanting in all cases.  In this sense and many others discussed *infra* Section II.A.2, the City is substantially compliant with the 2018 Order and portions of the March 2023 Order.  *See Barnett*, 2023 U.S. Dist. LEXIS 87333 at *19-21 (denying plaintiff's request to hold defendant in contempt and finding that defendant made all reasonable efforts to comply with a panoply of COVID-19 precautions and testing obligations, despite not accurately reporting some testing and admittedly not undertaking other testing, because the evidence established that officials were providing the necessary goods and services and had put in place "significant safeguards" for detainees' protection, the purpose of the litigation).  The City nevertheless provides the following explanations to address the specific areas of concern underlying Plaintiffs' Report and calculations.

---

[6] *See* Ex. A, ¶¶ 11-32.

### a.     Inaccurate Open Dates

The 2018 Order requires the City to prepare monthly reporting on citizen complaints that includes "the date the complaint was made." (Doc. 434 at 8, 9; *see also* Doc. 492 at 5 n.7.) The City is unable to offer any defensible explanation for the use of a different date—the date on which the file was opened in IA Pro, the system of record for OPS—in its reporting or in calculating compliance with the 180-Day Rule. The City began incorporating the "complaint made" date in its reporting beginning in July 2023 for complaints opened in the month of June.

### b.     Inaccurate Close Dates

The 2018 Order requires the City's reporting on citizen complaints to include "the date the complaint was finally adjudicated." (Doc. 434 at 8, 9.) As explained in detail in Exhibit A, the City interpreted this requirement to mean the date on which APD or OPS completed all investigative steps and discipline was issued, prompting the file to be closed in IA Pro. Historically, the City did not believe that notifying the complainant of the matter's disposition was essential to "final adjudication" (versus being an administrative, but related, task), and did not account for the time it took to send a Notification Letter in its calculation of 180-Day Rule compliance.[7]

---

[7] *See* Ex. A, ¶¶ 33-35. As the Court has done in the past, the City respectfully asks the Court to recognize that any noncompliance by the City with the 180-Day Rule prior to March 1, 2023 as it pertains to the parties' differing interpretations of what constitutes "final adjudication" of a complaint is not a result of bad faith. (*See* Doc. 401 at 20.)

Rather, OPS delegated the complainant notification function to the OPS Open Records Unit for completion in batches, typically corresponding to preparation of monthly productions for Plaintiffs.[8]

In the Court's March 2023 Order, however, the Court defined "final adjudication" in a footnote as "the date the [APD] notified the complainant of the final disposition of the complaint . . . and nature of any discipline imposed . . . ." (Doc. 492 at 5 n.7.)  The City is unable to offer any defensible explanation for the continued use after March 1, 2023 of a different date—the date on which the file was closed in IA Pro—in its reporting or in calculating compliance with the 180-Day Rule.  The City began incorporating the notification letter date in its reporting beginning in July 2023 for complaints closed in the month of June.

### c.    Other Inaccuracies in Monthly Reporting

As noted above, the City generates its monthly reporting from IA Pro, which was implemented years before this lawsuit as an off-the-shelf tool.[9]  As a result, there are several limitations with IA Pro that caused most errors identified in Plaintiffs' Exhibits R and S.  For example, for any citizen complaint in which there are multiple charges, IA Pro will mark all charges Sustained if any charge is Sustained.[10]

---

[8] Ex. A, ¶¶ 33-35.
[9] Declaration of Lieutenant Justina Collins, attached hereto as Ex. B, ¶¶ 5, 7.
[10] Ex. B, ¶ 8.

To further complicate matters, IA Pro duplicates data, from one time to twenty or more times for a single citizen complaint.  For instance, Mr. Roger Zachery's complaints against Officer Bernard Gallon involved a single sustained charge (2.21 Submitting Reports), but it appears twice in the City's reporting.



| Inc: IA No | Inc: Open da | Cit: First nam | Cit: Last nam | Off: First name | Off: Last name | Alg: Allegation | Inc: Disposition | Act: Action taken | Inc: Completed da |
|---|---|---|---|---|---|---|---|---|---|
| 22C0406MISC | 11/07/2022 | ROGER | ZACHERY | BERNARD | GALLON | 2.21 Submitting Reports | SUSTAINED | WRITTEN REPRIMAND | 04/03/2023 |
| 22C0406MISC | 11/07/2022 | ROGER | ZACHERY | BERNARD | GALLON | 2.21 Submitting Reports | SUSTAINED | WRITTEN REPRIMAND | 04/03/2023 |

(*See also* Plaintiffs' Ex. R at Rows 72-73.)  In yet another example, Mr. Bill White's complaint against Officer Ralph Woolfolk involved five charges, but each charge appears five times in the City's reporting.

| Inc: IA No | Inc: Open da | Cit: First nam | Cit: Last nam | Off: First name | Off: Last name | Alg: Allegation | Inc: Disposition | Act: Action taken | Inc: Completed da |
|---|---|---|---|---|---|---|---|---|---|
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 2.60 Fraternizing with Person Of Questionable Character | SUSTAINED | ORAL ADMONISHMENT | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 2.60 Fraternizing with Person Of Questionable Character | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 2.60 Fraternizing with Person Of Questionable Character | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 2.60 Fraternizing with Person Of Questionable Character | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 2.60 Fraternizing with Person Of Questionable Character | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 1.12 Transactions with Involved Persons | SUSTAINED | ORAL ADMONISHMENT | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 1.12 Transactions with Involved Persons | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 1.12 Transactions with Involved Persons | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 1.12 Transactions with Involved Persons | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 1.12 Transactions with Involved Persons | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 2.25 Private Business | SUSTAINED | ORAL ADMONISHMENT | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 2.25 Private Business | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 2.25 Private Business | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 2.25 Private Business | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 2.25 Private Business | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 2.33 Conformance to Directives | SUSTAINED | ORAL ADMONISHMENT | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 2.33 Conformance to Directives | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 2.33 Conformance to Directives | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 2.33 Conformance to Directives | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 2.33 Conformance to Directives | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 3.03 Arrest of or Court Actions Involving an Employee | SUSTAINED | ORAL ADMONISHMENT | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 3.03 Arrest of or Court Actions Involving an Employee | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 3.03 Arrest of or Court Actions Involving an Employee | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 3.03 Arrest of or Court Actions Involving an Employee | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |
| 22C0311MISC | 09/02/2022 | BILL | WHITE | RALPH | WOOLFOLK | 3.03 Arrest of or Court Actions Involving an Employee | SUSTAINED | NO ACTION TAKEN | 04/14/2023 |

(*See also* Plaintiffs' Ex. R at Rows 104-28.)   Mr. White's complaint also demonstrates the impact of IA Pro's misapplication of the Sustained charge (3.03 Arrest of or Court Actions Involving an Employee).

The City failed to adequately recognize and account for these system limitations when it negotiated and agreed to the 2018 Order or to properly scrub the

data prior to transmission to Plaintiffs.   In retrospect, the City should have approached Plaintiffs and the Court about these circumstances and the time and effort needed to develop a solution.   The City has not resolved the technical issues with IA Pro but began manually removing duplicates for reporting provided to Plaintiffs in approximately August 2023.

Importantly, however, of the $602,000 in Coercive Sanctions Relating to Provision of Inaccurate Information proposed by Plaintiffs (*see* Doc. 515 at 51), $385,000 comes from automated and accidental data misapplication or duplication. *See* Ex. S.  In the examples above, Mr. Zachery's complaint generates $5,000 in sanctions (including counting an incorrect open date twice and an incorrect close date twice), and Mr. White's complaint generates $78,000 based on twenty-five repeated open dates, twenty-five repeated close dates, sixteen repeated dispositions, and other repetitive errors.   The City's deeper analysis of this issue appears in Exhibits S, S-1, S-2, S-3, and S-4.  Although the Court explained that "in the monthly spreadsheets produced by the City, an incorrect complaint date, an incorrect complaint resolution date, an incorrect disposition of an individual allegation, and an incorrect disciplinary sanction for an individual allegation, [would] each be considered a separate items of inaccurate information" (Doc. 492 at 6 n.8), the City respectfully submits that the Court did not envision that a single inaccurate piece of

information from one of these four categories—listed several times due to a database error—would result in exponential sanctions.

### d.   Inaccuracies in Notification Letter Content

As noted above, OPS's historical practice was to delegate the Notification Letter preparation function to the OPS Open Records Unit for completion in batches, typically corresponding to preparation of monthly productions for Plaintiffs.[11]  This approach inappropriately created time delays and constraints that led to errors, and OPS did not have the appropriate oversight or review processes in place at the time.

Additionally, until June 8, 2023, OPS had a cache of templates that had been in use for many years.[12]  The lack of document control and review of the templates' content when the 2018 Order was negotiated often resulted in imprecise and confusing letters.[13]  The templates now have been replaced with a single form letter tailored to the *Calhoun* requirements.[14]

### 2.   The City Recently Implemented a Series of Remedial Measures with Measurable Positive Effects on Tracking Timely Complaint Resolution and Accurate Reporting

With the filing of Plaintiffs' May 31, 2023 Motion, the City immediately sought to ensure that leadership at all levels of APD and OPS understood the precise

---

[11] Ex. A, ¶ 34.
[12] Ex. B, ¶ 17.
[13] *See* Ex. A, ¶ 44.
[14] Ex. A, ¶ 44; Ex. B, ¶¶ 15-16.

requirements of the 2018 Order and subsequent orders of this Court, as well as historical and current processes. The City acknowledges that these measures were reactive. Nevertheless, OPS has implemented the processes necessary to ensure future compliance through the following actions:

### a. Improved Communication and Internal Training

Members of APD Command Staff, including Zone Commanders, OPS, Planning Research and Accreditation Unit, and Tactical Crime Analysis Unit, participated in three collaborative sessions concerning the 2018 Order and March 2023 Order requirements, which took place on June 12, 2023, June 21, 2023, and June 28, 2023.[15] The first two meetings included an in-depth review of the 2018 Order and March 2023 Order requirements, a discussion of issues and updates related to monthly and/or quarterly productions, and a question/answer session.[16] The third meeting focused solely on OPS's productions—specifically, a detailed analysis of the current OPS process from beginning to end and how the process has been and can be improved.[17]

---

[15] *Calhoun* Order Training Agenda, dated June 12, 2023, attached hereto as Ex. E-1; *Calhoun* Meeting Minutes/Notes, dated June 21, 2023, attached hereto as Ex. E-2; and *Calhoun* Order Training Agenda, dated June 28, 2023, attached hereto as Ex. E-3.
[16] Ex. E-1; Ex. E-2.
[17] Ex. E-3.

OPS has continued its practice, implemented in approximately March 2023, of enhanced communication with the Zones concerning open citizen complaints.[18] An OPS Lieutenant receives weekly reports on open citizen complaint files and actively monitors progress in the Zones, conferring regularly with the relevant Administrative Lieutenants and Sergeants to discuss status and ensure timely disposition given the number of additional steps in the adjudication chain.[19]  In addition, Chief of Police Darin Schierbaum assigned an additional Sergeant to OPS, to ensure a designated supervisor was responsible for monitoring and promoting maximum *Calhoun* compliance.[20]

### b.      Process Improvements

After learning about inconsistencies in and omissions from Notification Letters, on June 8, 2023, an OPS Lieutenant created a new form Notification Letter with pre-filled dropdown options for the efficient and uniform reporting of information to complainants.[21]  OPS implemented it within days,[22] and the rollout has been successful, though not perfect.[23]

---

[18] *See* Ex. A, ¶¶ 18-19, 48-49.  (*See also* Doc. 484 at 3-4 (reflecting that OPS instituted a new reporting system involving Commanders, Majors, and Lieutenants to ensure timely completion of investigations).)

[19] *See* Ex. A, ¶¶ 18-19, 48-49.

[20]  Ex. C, ¶ 8.

[21] Ex. B, ¶ 16.

[22] *See* Ex. B, ¶ 17.

[23] The City has identified two letters in Plaintiffs' Exhibits, for example, that OPS generated after June 8, 2023, but used an old template.

OPS also modified its Notification Letter drafting and mailing processes to conform to the Court's definition of "final adjudication," which differs from the date an investigation concludes.[24]   Rather than draft and mail Notification Letters in batches near month-end in anticipation of mid-month reporting deadlines, an officer with more than ten years of experience at OPS now prepares a Notification Letter for each file on the date that the file is closed in IA Pro, complete with a certified mail tracking number.[25]   Additionally, the Notification Letters are taken to APD Headquarters for mailing on the day they are prepared or the following day.[26]

Importantly, for many years, OPS has discussed modernizing its standards system.   As discussed in more detail in Exhibit B, the current system is predominantly manual.  It relies on paper forms, wet-ink approvals, and tracking by Excel spreadsheet.[27]   Communication between and among OPS and disciplinary authorities in the field about findings and approvals occurs through e-mail or interoffice mail.  In March 2023, however, APD received authorization and an

---

[24] Ex. A, ¶ 42.  An investigation concludes when: (1) there is an "RNO" (recommend not open) finding by OPS or analogous finding in the field, as reported on a Form 859; (2) the subject employee is exonerated of all charges and OPS receives the completed file, including all necessary signatures, for closeout in IA Pro; or (3) when discipline has been issued and OPS receives the completed file, including all necessary signatures, for closeout in IA Pro.  *See id.* ¶¶ 16, 25, 31.

[25] Ex. A, ¶¶ 42, 45.

[26] *See* Ex. A, ¶¶ 42, 43.

[27] Office of Professional Standards Transition from Paper Files to Fully Digitized Format for Axon Standards, attached hereto as Ex. B-1.

appropriation from City Council to develop a system that will centralize, standardize, track progress for, and partially automate OPS's processes for addressing complaints of all types.[28]  To speed development and simplify training, OPS elected to capitalize on the existing infrastructure used for all Use of Force reporting in selecting a service provider for the new system.[29]  Training will commence in December 2023 for civilian and sworn supervisors,[30] and OPS will roll out the platform for internal complaints and citizen complaints in December and January, respectively.[31]  As the system has been tailored to OPS's needs, it includes functionality specifically designed to address this Court's requirements.[32]

### c. Dedicated Lieutenant Resource and Retention of Outside Counsel for Review

In approximately March 2023, OPS secured an additional lieutenant from APD to assume certain dedicated *Calhoun* responsibilities temporarily.[33]  In the beginning of April 2023, Lieutenant Reginald Burks joined OPS and assumed responsibility for increased coordination with the Zones, as discussed above, and assessment of OPS file completeness and accuracy of certain reporting in

---

[28] Ex. C, ¶ 7; 23 Res. 3277, 2023 Atlanta City Council (Ga. 2023), attached hereto as Ex. L.

[29] Ex. B, ¶ 9.

[30] Sworn supervisors include all ranks at or above Sergeant.

[31] Ex. B, ¶ 14.

[32] *See* Ex. B, ¶ 9.

[33] Ex. A, ¶ 48.

anticipation of monthly production to Plaintiffs.[34]  Additionally, in May 2023, the City engaged outside counsel for another layer of monthly production review.[35] Each month, two attorneys review the citizen complaints and certain components of the production spreadsheets to verify the open and close dates, dispositions, and discipline imposed.

> **d.** **Prioritization of Resolving Issues Identified by Plaintiffs**

As of the date of this filing, all Notification Letters alleged by Plaintiffs to never have been sent (Plaintiffs' Exhibits H and N) or to contain errors (Plaintiffs' Exhibits I, J, K, O, P, and Q) have been sent or corrected and re-sent via certified mail or e-mail.[36]

> **e.** **Current State of Compliance with 180-Day Rule**

 For citizen complaints closed in October, approximately 92 percent were finally adjudicated within 180 days.[37]

---

[34] Ex. A, ¶ 49.

[35] Notice of New Matter ("NNM") to Hall Booth Smith, P.C. ("Hall Booth") from Nina Hickson, attached hereto as Ex. R.  Although the NNM was fully executed recently, note the Anticipated Start Date in May 2023.

[36] *See* Exs. H, I, J, K, N, O, P, and Q.

[37] *See* "OPS Monthly Production for Oct. 2023," attached hereto as Ex. T.  One complaint was made before April 1, 2023 and thus exceeds the 180-day mark. Inclusion of RNO files reported in October does not materially change the compliance percentage.

## II.   PROPOSED   MONETARY   SANCTIONS   AND   SPECIFIC OBJECTIONS TO EXHIBITS

### A.   The   Proposed   Sanctions   Are   Not   Proportional   to   the Noncompliance and Do Not Advance *Calhoun*'s Reform Goals

#### 1.   Statistics Regarding Outstanding Complaints by Year

The City recognizes the value and importance of accuracy, transparency, and prompt resolution of citizen complaints, and concedes that it has made errors.[38]  The City, however, urges the Court to consider the nature and quantity of the errors in context.

Between 2020 and 2022, OPS received approximately 428 citizen complaints. Of those complaints, 65 (or approximately fifteen percent) account for *all* but approximately $122,000 of the millions in sanctions proposed by Plaintiffs.[39]  Said differently, of the 87 unique citizen complaints presented by Plaintiffs as problematic, 65 generate *98.66 percent* of the total proposed sanctions, driven by Plaintiffs' argument that those 65 files remained "open" longer than 180 days—in most cases because of the City's failure to mail, successfully deliver, or prepare an accurate Notification Letter, *not* because the investigation was not actually

---

[38] *See* Ex. A, ¶¶ 34, 35, 41.

[39] *See* Ex. F-1. $122,000 of the proposed sanctions is comprised of suspended sanctions referenced by the Court in the March 2023 Order ($50,000) and twenty-two complaints (totaling $72,000) for which there were reporting inaccuracies only (*i.e.*, appear on Plaintiffs' Exhibit S and nowhere else).

complete.[40]  The City respectfully submits that repeatedly sanctioning the same 65

complaints, though technically correct under the Court's March 2023 Order, is

unduly punitive and far more than necessary to ensure Plaintiffs' allegations are

addressed (since all now have been finally adjudicated consistent with the Court's

March 2023 Order) and to promote the City's commitment to compliance going

forward.  *See In re McLean*, 794 F.3d at 1323; *Mercer*, 908 F.2d at 768 n.9.

### 2.     Status of Compliance with Other Elements of the 2018 Order

The imposition of a multi-million-dollar sanction for noncompliance with the

180-Day Rule and related reporting is disproportionate in the context of the entire

2018 Order.  Of the seven components of required compliance in the 2018 Order,

six never have required review or intervention by the Court.  The City discusses the

four substantive *Calhoun* components here.[41]

---

[40] *See id.*

[41]  In addition to the components described *infra* Sections II.A.2.a through II.A.2.d,
Plaintiffs are entitled to reasonable attorneys' fees and the reimbursement of any
costs they reasonably expend in ensuring compliance with the Orders of the Court.
(Doc. 434, § IX.)  Where instances of delayed or missing attorneys' fees checks have
been reported, the City has investigated the cause of the delayed or missing check
and ensured that Plaintiffs' counsel are reimbursed.  Although the City has on
occasion inquired with Plaintiffs' counsel regarding certain fees billed and sought
additional information consistent with the process outlined in Section IX(2) of the
Court's 2018 Order (Doc. 434 at 16), neither disputes nor non-payment ever have
required intervention by the Court.  The 2018 Order also grants Plaintiffs the right
to conduct post-judgment discovery to monitor compliance.  (Doc. 434, § VII.)  As
a show of good faith and collaboration, the discovery process between current
counsel for the parties mostly has been informal.  Upon receiving requests from

### a.     Training

The 2018 Order required the City to complete an initial training ("Approved Training") and a recurring training every two years thereafter.  (Doc. 434, § I(A).) The initial Approved Training was offered from December 2018 through January 2019.  In 2020 and 2022, the training was repeated, and to date, there have been no challenges to the implementation of the training itself.  Plaintiffs did inquire in approximately mid-October 2022 about data derived from the training database for testing "attempts."  In response, after discussing the data and its accuracy with the program developer Brain Rain Solutions, the City discovered a technological limitation impacting the computation of incorrect answers.  Instead of using 2022 as a separate testing period, the system reported cumulative "attempts" for 2020 and 2022.  This limitation has since been resolved by the program developer and the City provided supplemental reporting with corrected "attempts" for 2022, without the necessity of involving the Court.

### b.     Stop and Think Forms

The 2018 Order requires APD to produce portable document format ("PDF") files of all "Stop and Think" Forms, End of Shift Forms, Criminal Trespass warnings (electronic and handwritten), and Field Interview forms from the preceding month.

---

Plaintiffs' counsel, the request is relayed to the appropriate personnel without the need for formal discovery procedures.  As a result, the issue of discovery compliance, or lack thereof, has not been the subject of review by this Court.

(Doc. 434, § IV(B)(3)(a).)  Where alleged failures to complete a required Stop and Think form have been reported, APD has reviewed and addressed them through the appropriate corrective and/or disciplinary processes or by explanation to Plaintiffs why a form was not required.  Though the parties have differing perspectives on the application of relevant policies, no such incidents have necessitated the Court's intervention.

### c.      Identification Requirement

The 2018 Order requires APD to make available for review all SWAT and Tactical photos and videos from the preceding month that are subject to disclosure. (Doc. 434, § V(C).)  Since 2018, the City has maintained a collaborative relationship with Plaintiffs' counsel to allow for the periodic review of APD body worn camera ("BWC") videos.  If a failure to wear identification is reported, APD has reviewed and analyzed the BWC footage and commenced an investigation and/or the disciplinary process pursuant to APD.SOP.2020.   No such incidents have necessitated the Court's intervention.

### d.      Standard Operating Procedures ("SOPs")

Under the 2018 Order, APD is required to: (1) provide every SOP in effect as of 12/31 of the previous year; (2) provide copies of Five-Day Reporting SOPs ("*Calhoun* SOPs") in Word and PDF; (3) provide a revision list of all SOPs implemented, revoked, or modified; and (4) provide a separate revision list for all

*Calhoun* SOPs.  (Doc. 434, §§ II(C)(1) & (2).)  To date, the City's compliance with the quarterly production of APD SOPs and the timely five-day reporting of any proposed changes to *Calhoun* SOPs have not been challenged.

### B.     The City's Lesser Proposed Sanctions Ensure Compliance

As noted above, the City does not dispute that Plaintiffs have identified errors that qualify for coercive sanctions under this Court's March 2023 Order.  This Court, however, "retains inherent power to waive the sanction in a particular case."  *Sizzler Family Steak Houses*, 793 F.2d at 1537.  The City respectfully requests that the Court evaluate the following alternative proposals, which command compliance with the 180-Day Rule and related reporting requirements to the same degree as Plaintiffs' $5.288 to $9.110 million sanctions proposals,[42] while taking into account the City's overall performance under the 2018 Order, progressive remedial measures, and limited resources.

---

[42] The variation in Plaintiffs' proposals relates solely to alternative treatment of Notification Letters that did not specify the discipline imposed.  Plaintiffs view such complaints as "open" until disciplinary information is provided, resulting in $9.110 million in sanctions.  (*See* Doc. 515 at 30-31, 51 (Option One); Plaintiffs' Exs. J and P.)   Plaintiffs also proposed an option in which the Court may treat these substantially compliant but incomplete Notification Letters as "closed," resulting in $5.288 million in sanctions.  (*See* Doc. 515 at 30-31, 51 (Option Two); Plaintiffs' Exs. K and Q.)

### 1.    Option One: Redirection of Sanctions Payment to Dedicated Calhoun Compliance Resources

Per the Court's March 2023 Order, if coercive sanction payments are imposed, they shall be paid to the United States Treasury.  (Doc. 492 at 3 n.4.)  Although the City fully understands and respects the Court's need to ensure compliance with its orders and the Treasury's ever-present debts and obligations, the proposed reallocation of public safety and compliance resources from the City undermines *Calhoun*'s core objectives and infringes *McLean*'s limiting principle that sanctions should not be "greater than necessary."  *In re McLean*, 794 F.3d at 1323.  As addressed in the Declarations of Chief of Police Darin Schierbaum and the City's Chief Financial Officer, Mohamed Balla, sanctions of the proposed size either will operationally impact APD's budget—likely in training, recruiting and retention, and funding for the Atlanta Citizen Review Board ("ACRB")[43]—or will require restricted reserve funds, available only by approval of the Mayor and City Council.[44] Notably, the proposed sanctions amount to 156 percent to 269 percent of the full Fiscal Year 2024 training budget, and the lowest level of Plaintiffs' proposed sanctions exceeds available funds by approximately $3 million as of the date of this

---

[43] The ACRB also investigates and mediates cases of alleged police misconduct by APD and the Atlanta Department of Corrections.  OPS may conduct a second investigation of such conduct if referred.  Ex. A, ¶ 12.
[44] Ex. C, ¶ 11; Ex. D, ¶¶ 5, 18.

filing.[45]   The percentages multiply for the other impacted areas: the proposed sanctions constitute approximately 511 percent to 881 percent of the full recruiting and retention budget, and approximately 323 percent to 556 percent of the full ACRB budget.[46]   These funds are critical for ensuring the continuity of broader *Calhoun* reforms and other Department initiatives.[47]

The City respectfully asks the Court to exercise its discretion and waive payment of any sanction imposed, with the direction that any such amount be earmarked for dedicated *Calhoun* compliance and monitoring resources or measures, whether currently underway (such as the Axon modernization effort expected to cost the City more than $90 million over ten years and/or the supplemental production review process conducted by Hall Booth), or retention and training by outside counsel of more than five additional skilled personnel resources for OPS, who will dedicate part of their time to 180-Day Rule monitoring and compliance in lieu of personnel with public safety and investigative obligations.  *See Loc. 28 of Sheet Metal Workers' Int'l Ass'n*, 478 U.S. at 442-44 (upholding contempt sanctions imposed on union and its apprenticeship committee, including fines to finance a fund dedicated to increasing pool of qualified nonwhite applicants for apprenticeship

---

[45] Ex. D, ¶ 10; *see also* Ex. C, ¶ 11.
[46] Ex. D, ¶¶ 14, 17.
[47] *See* Ex. D, ¶¶ 7, 11, 12, 15, 16; Ex. C, ¶¶ 10-11.

program and an order requiring the union to pay for a computerized record keeping system maintained by outside consultants).

> **2.** **Option Two: $1.142 million to $1.742 million under a Cap Rubric, Combined with Elimination of Duplicated Sanctions and Other Minor Downward Adjustments**

On March 1, 2023, the Court imposed suspended sanctions in the amount of $25,000.  (Doc. 492 at 3 (180-Day Rule compliance), 5 (Inaccurate Information).) This amount is the single highest sanction imposed on the City to date.  Of the 65 unique complaints presented by Plaintiffs' counsel with sanctionable Category A or B issues, all but four exceed this $25,000 high point by anywhere from $4,000 to $151,000.[48]  This does not account for the *additional* sanctions—from $2,000 to

---

[48] *See* Plaintiffs' Ex. G (Williams and Thompson) and Ex. M (Harris and Duse).  If the Court chooses to treat as "closed" those matters for which the only item missing from the Notification Letter is discipline (Plaintiffs' Exs. J and Q), an additional 24 of the 65 citizen complaints would drop below the $25,000 cap, of which fourteen complaints (open five to nineteen days beyond 180 days) arguably fall within Plaintiffs' definition of "substantially compliant" (*see* Doc. 485 at 22) such that no sanction would be warranted, and ten complaints drop to $0 (closed timely within 180 days or the grace period).  *See* "Table of Unique Complaints with Sanction Totals Exceeding $25,000 (Excluding Sanctions from Exhibit S Reporting Inaccuracies)," attached hereto as Ex. F-4, which extracts and lists in one place the unique complaints from Plaintiffs' exhibits with alleged 180-Day Rule noncompliance  (Exhibits G, H, I, J, K, M, N, O,  P, and Q) and identifies whether total sanctions per complaint (*excluding* reporting violations within Exhibit S) exceeds $25,000.  The unique complaints in Exhibit F-4 and their respective capped sanctions form the basis of "Table of Sanction Totals with Proposed Cap and Corrections by Exhibit," attached hereto as Exhibit F-2, in the light blue highlighted column.

$78,000—that attach thereafter for alleged inaccuracies (Exhibit S) for 75 percent of the files.[49]

Considering the relatively small number of complaints at issue compared to OPS's traditional workload and the materially significant duplication of complaints, the City proposes that the Court cap sanctions imposed daily at $25,000 per complaint for the Category A or B violations. This Court previously has utilized a cap on coercive sanctions when imposed daily and the possibility of accumulation was high due to the magnitude of data involved. *See Acosta v. Jasper Contractors, Inc.*, 16-CV-3845, 2017 WL 8186721, at *3 (N.D. Ga. July 24, 2017) (adopting magistrate's recommendation to order coercive sanctions of a $1,000 daily fine until violations have been cured, with a maximum of $30,000, where respondent had not adequately complied with subpoena because of its mixed production of thousands of responsive and non-responsive documents).

In addition, the City proposes the following additional downward adjustments, which are relatively minor:

- For up to eighteen complaints, the City substantially complied with the 180-Day Rule, meaning open twenty-five days or less beyond 180 days, and the Notification Letter requirements. *See* Exs. G, K, M, and Q. (*See* Doc. 485 at 22 (Plaintiffs acknowledging that "complete and literal compliance is an ideal and difficult to achieve in the real world" and "*more than 25 days beyond 180 days*" shall be excluded from substantial compliance) (emphasis added)). Thus, the Category A or B sanctions imposed for these cases would be $0.

---

[49] *See* Ex. F-1 and discussion *supra* Section I.C.1.c.

- As previously discussed, the City asks the Court to discount sanctions accumulated because of database-driven reporting limitations, reducing sanctions for inaccuracies from $602,000 to $217,000. *See supra* Section I.C.1.c and Exs. S, S-1, S-2, S-3, and S-4.

If, in its discretion, the Court agrees to factor in these reasonable modifications and corrections, the City submits the appropriate sanction amounts for Option Two and Option One, as presented in Plaintiffs' Report, are $1.142 million (reduced from $5,288,000) to $1.742 (reduced from $9,110,000), respectively.[50]   The City's detailed analysis of this calculation appears in Exhibit F-2 in columns highlighted in light blue.

### 3.    Option Three: Reduced Sanctions Due to Errors in Plaintiffs' Exhibits and Data Duplication

If the Court disagrees with the City's proposal to implement a cap on Category A and B sanctions, in Exhibit H the City has noted its specific objections to two Notification Letters that Plaintiffs claim never were sent but in fact were delivered, reducing the proposed sanctions by more than $200,000.[51]   The City maintains that

---

[50] If the Court were to impose a universal cap on a *per complaint* basis, inclusive of alleged 180-Day Rule (Category A or B) and Inaccuracy (Exhibit S) issues, the City submits the appropriate sanction amounts for Option One and Option Two, as presented in Plaintiffs' Report, are $1.579 million (reduced from $9,110,000) and $1.040 million (reduced from $5,288,000), respectively. *See* "Calculation of Proposed $25K Per Complaint Cap (Including Sanctions from Exhibit S Reporting Inaccuracies)," attached hereto as Ex. F-3.

[51] *See* Response to Plaintiffs' Exhibit H (Favors and Lamartiniere), attached hereto as Ex. H.

the reductions for substantially compliant complaints and data duplication discussed *supra* remain warranted.  Factoring in this narrowed set of modifications and corrections, the City submits the appropriate sanction amounts for Option One and Option Two, as presented in Plaintiffs' Report, are $8,480,000 (reduced from $9,110,000) and $4,531,000 (reduced from $5,288,000), respectively.  The City's detailed analysis of this calculation appears in Exhibit F-2 in columns highlighted in orange.

    **C.**    **Plaintiffs' "Recommendation for Remedial Order in Lieu of Additional Financial Sanctions" Seeks Unnecessary and Inappropriate Modifications to the 2018 Order**

    **1.**    **Standard of Review**

"For the purposes of modification, consent decrees . . . are treated as judicial acts, akin to injunctions." *Jacksonville Branch, N.A.A.C.P. v. Duval Cnty. Sch. Bd.*, 978 F.2d 1574, 1578 (11th Cir. 1992).  "A district court has broad discretion to modify an existing injunctive order . . . , as long as notice and an opportunity to be heard are provided before the modification is made." *Reynolds*, 338 F.3d at 1227 (internal quotation and citation omitted).  That said, "[a] party seeking to modify a consent decree has a high hurdle to clear and the wind in its face." *Sierra Club v. Meiburg*, 296 F.3d 1021, 1034 (11th Cir. 2002). "[A] party seeking modification of a consent decree bears the burden of establishing that a *significant change in circumstances* warrants revision of the decree," which may be met "by showing a

significant change either in factual conditions or in law." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 384 (1992) (emphasis added). A "significant change" in "factual conditions" may be found: (1) "where changed factual conditions have made compliance with the decree substantially more onerous"; (2) "when a decree proves to be unworkable because of unforeseen obstacles"; (3) "when enforcement of the decree without modification would be detrimental to the public interest"; (4) when "significant time has passed and the objectives of the original agreement have not been met despite the defendants' efforts"; or (5) "when a continuation of the decree would be inequitable." *Reynolds*, 338 F.3d at 1226-27 (internal quotations and citations omitted). "Once a moving party has met its burden of establishing either a *change in fact or in law* warranting modification of a consent decree, the district court should determine whether the proposed modification is *suitably tailored* to the changed circumstance." *Rufo*, 502 U.S. at 391 (emphasis added).

The court's "broad remedial power contained within the modification and compliance enforcement powers can be used to extend a consent decree," but only if "such compliance enforcement is *essential* to remedy the violation and thus provide the parties with the relief originally bargained for in the consent order" or "upon making a finding that *conditions have changed so that the basic purpose of the original consent decree has been thwarted*, meaning that time and experience have demonstrated that the decree has failed to accomplish the result that it was

33

specifically designed to achieve." *Holland v. N.J. Dep't of Corr.*, 246 F.3d 267, 281-84 (3d Cir. 2001) (internal quotations and citation omitted) (emphasis added). Further, extension of a consent decree is limited to the part(s) of the consent decree that are "necessary to remedy the violation." *See id.* at 286 (holding that the district court's ten-month extension of the entire consent decree was not supported by the court's "very limited findings" of defendant's substantial non-compliance with "only one minor part" of the consent decree, "especially in light of the Supreme Court's admonition that a court's compliance enforcement power is 'not unlimited'") (quoting *Spallone v. United States*, 493 U.S. 265, 276 (1990)).

## 2.    The City Consents to Use of Trackable Mail

The City consents to the use of trackable mail for all Notification Letters. This is the current practice, though not perfect.[52]   The City will continue to deliver Notification Letters via certified mail pursuant to the process outlined above and in Exhibit A where no e-mail address has been provided.[53]

---

[52] *See* Ex. A, ¶ 45.

[53] *See* Ex. A, ¶¶ 42, 43, 45.  Although the City agrees to use trackable mail to facilitate monitoring by Plaintiffs, the City believes that assuring delivery of Notification Letters exceeds the scope of the 2018 Order and is not required under prevailing law.  Specifically, Georgia and applicable federal law do not require the monitoring or assurance of actual delivery, even when a notice directly implicates a private citizen's legal rights, such as in an EEOC right-to-sue-letter or in the context of bankruptcy.  As the Eleventh Circuit recognized in *Konst v. Fla. E. Coast Ry. Co.*, 71 F.3d 850, 851 (11th Cir. 1996), "[t]he common law has long recognized a rebuttable presumption that an item properly mailed was received by the addressee.

3.    **Inclusion of Plaintiffs' Counsel in E-mail Communications to Complainants Exceeds the Scope of the 2018 Order and Impacts Complainants' Privacy Rights**

The City opposes any requirement that it blind copy Plaintiffs' counsel on all Notification Letters sent via email.  This request exceeds the scope of the 2018 Order and subsequent orders.  Although Plaintiffs are entitled to information for purposes of monitoring and discovery, nothing in the 2018 Order suggests that Plaintiffs' counsel should be embedded in the City's notification process in real time.  Further, the City is concerned that inviting Plaintiffs' counsel into the notification process without complainants' consent impacts complainants' privacy.  Though Plaintiffs' counsel have contacted complainants in connection with their monitoring activities and some complainants agree to provide them information, the City does not want to be perceived as imposing an obligation on complainants to do so or inappropriately disclosing complainants' information, even though it is available and provided through other lawful channels.

Further, as explained in Exhibit A, in approximately July of this year, the City transitioned to a dedicated e-mail mailbox for the transmission of Notification

---

The 'presumption of receipt' arises upon proof that the item was properly addressed, had sufficient postage, and was deposited in the mail."  Similarly, nothing in the Federal Rules of Civil Procedure requires the monitoring of actual delivery when serving an opposing party in litigation with court papers.  The City does not have the resources to monitor tracking and ensure delivery of every Notification Letter that is mailed.

Letters; once a "sent" receipt has been received, an OPS Senior Patrol Officer prints it, and it becomes part of the OPS file.   Under multiple policies, including APD.SOP.2020 § 4.14 and APD.SOP.1050, and the Georgia Open Records Act, OPS must maintain a permanent file for all complaints, investigation files, and disciplinary actions.[54]  The City currently is not aware of, and Plaintiffs have not provided any evidence of, issues with retention of such communications or a widespread failure to produce them when required or requested.

> **4.    Required Reporting of Policy, Directive, Rule, or Regulation Violations Below the Work Rule Level Is Unduly Burdensome at This Time, But the City Already Has Made Efforts to Cite Such Information in Notification Letters**

Plaintiffs allege that the City has "long used" APD Work Rule 4.2.33 (Conformance to Directives) and APD Work Rule 4.1.1 (Appropriate Action Required)—which Plaintiffs describe as "catch-all concepts"—to purposefully conceal and obscure the disposition of citizen complaints. (Doc. 515 at 40, 44.) Plaintiffs further claim that any citation to APD Work Rule 4.2.33 (Conformance to Directives) and APD Work Rule 4.1.1 (Appropriate Action Required) render the disposition "inaccurate;" and because, in Plaintiffs' view, an inaccurate disposition means that the complaint it still open, each of these alleged violations should result in yet another $1,000 per day sanction.  (Doc. 515 at 47.)

---

[54]  APD.SOP.2020, attached hereto as Ex. A-1, § 4.14; APD.SOP.1050, attached hereto as Ex. U.

Plaintiffs' allegations of malice and a concerted coverup are unwarranted and unsubstantiated, as well as inconsistent with the significant level of detail within investigative files for each complaint that the City provides to Plaintiffs every month. Further, Plaintiffs have not carried their burden of demonstrating a "significant change in circumstances" that could support the imposition of new notification and reporting requirements on the City. *Rufo*, 502 U.S. at 383. OPS's longstanding process of citing, *where appropriate*, violations of APD Work Rules 4.1.1. or 4.2.33 (instead of SOPs or other directives, rules, or regulations) is an administrative necessity.

First, APD's Disciplinary Process SOP mandates the investigation and imposition of appropriate discipline for all sustained "Work Rules or City ordinance violations," *not* sustained SOP violations.[55] And not every SOP has a directly corresponding Work Rule. For example, though APD commenced its phased rollout of BWCs for public interactions with law enforcement interactions in approximately November 2016, there is no Work Rule saying that officers must wear and use one. Thus, if an officer fails to wear or to turn on his or her BWC as required and an investigation sustains the violation, OPS *must* cite to Conformance to Directives as the Work Rule violation. Indeed, that is the explicit purpose of Conformance to Directives—to capture any instance in which an employee fails to "conform to the

---

[55] APD.SOP.2010, attached hereto as Ex. A-2.

rules, regulations, directives, and standard operating procedures of the Department."[56]

Second, APD has hundreds of Work Rules and SOPs.[57]  Unfortunately, not all forms and files capture the underlying SOP, directive, rule, or regulation consistently, particularly those investigations that occur in the Zones.  Citing this information in a Notification Letter requires manual review of the file, followed by manual data entry on the letter itself because the "Rule" field is not supported by dropdown functionality, nor would it be practical to do so because it would require scrolling through hundreds of options.[58]  Even so, since Notification Letters now are prepared at the same time a citizen complaint is closed and by the same individual (requiring one full file review instead of two), the City started in approximately early July 2023 to manually add underlying policy violations in Notification Letters for Work Rule violations arising under 4.2.33 (Conformance to Directives), though the rollout may have been inconsistent.

Although the City has implemented new measures to ensure Notification Letters are accurate and already has included some of the information Plaintiffs request, this added detail increases the time for completion, review, and the likelihood of errors and typos, while not guaranteeing a commensurate level of

---

[56] Ex. A-2.
[57] Ex. A, ¶ 5.
[58] Ex. B, ¶ 19.

benefit to the complainant.[59]  Plaintiffs' counsel's arguments about confusion that complainants may experience is hypothetical and, again, unsubstantiated.  As detailed by Lieutenant Collins, what APD or OPS investigates, how it is charged, and how it is disposed all are different concepts that require some application of subjective judgment and discretion.[60]  For this reason, the City explicitly offers complainants the opportunity to review the full file, ask questions about the disposition, and appeal complaints involving allegations of certain serious misconduct if they are unsatisfied with the disposition.[61]

Third, at present, like with Notification Letters, *reporting* underlying SOPs, directives, rules, or regulations violations to Plaintiffs will be significantly manual. The OPS personnel responsible for preparing and reviewing the monthly reports will be required to download and format available data from IA Pro (which is limited to the title level for SOPs); review the hard copy file; and manually input any necessary sub-level details.  The burden upon the City and upon Plaintiffs is equal in this respect, and there is no reason to shift it to the City without compelling evidence of "significant[ly] changed circumstances," like harm to complainants or other malfeasance on the part of OPS or APD, since the 2018 Order's plain language does

---

[59] *See* Ex. B, ¶¶ 23-24.
[60] Ex. B, ¶¶ 20-22.
[61] Ex. B-2 (Sample Notification Letter); *see also* Ex. A-2 (APD.SOP.2020 § 4.3.4).

not require it and Notification Letters—which also are produced to Plaintiffs—now contain such information. *Rufo*, 502 U.S. at 383.

The City, however, will be glad to engage in good faith discussions about modifying the Notification Letter requirements, if necessary, and monthly reporting once its new standards system—which requires capture of the information Plaintiffs request and will be extractable—is up and running.

> **5.    Plaintiffs' Request for an Extension is Both Premature and Unwarranted Given the City's Substantial Compliance with the 2018 and March 2023 Orders as a Whole**

As the Court is aware, the City has been under reporting requirements in this case since 2010.  In 2018, the parties renegotiated and restructured the requirements of the 2010 Consent Order (Doc. 265) and the 2015 Contempt Order (Doc. 289). Most of the 2018 Order's provisions that grant Plaintiffs direct access to information regarding the City's performance will not expire until November 29, 2024.  (Doc. 434, §§ II(D), III(D), IV(C), V(D), VII(D), IX(4).)   Plaintiffs' request for an extension is premature and unwarranted.  The City still has a full year to ensure its continued compliance with the 180-Day Rule, including the provision of accurate information that facilitates Plaintiffs' monitoring.  Most cases addressing extension of consent decrees arise in motions brought within two months of the decree's

expiration, thus giving the defendants the benefit of a full and recent lookback for determining whether an extension is necessary.[62]

Moreover, as the City has noted, the 2018 Order outlined six *other* requirements beyond the 180-Day Rule.[63]   None of these six—(1) Training, (2) Standard Operating Procedures, (3) Stop and Think Forms, (4) Identification, (5) Discovery, and (6) Attorneys' Fees—have required Court intervention.   Plaintiffs also have not brought to the City's or this Court's attention concerns regarding any of the additional remedial requirements ordered by the Court in March 2023. Plaintiffs have not alleged that the City has failed to provide "a copy of all Citizen Complaints made during the previous calendar month in whatever form the complaint was made" nor have Plaintiffs alleged that the City failed to provide "a sworn affidavit, or a declaration under penalty of perjury, by the commander of each

---

[62] *See, e.g.*, *Thompson v. United States HUD*, 404 F.3d 821, 824-25 (4th Cir. 2005) (on May 23, 2003, plaintiffs moved for extension of the consent decree, which was set to expire on June 25, 2003); *Barnett*, 2023 U.S. Dist. LEXIS 141650, at *4-5 (on May 12, 2022, the night before the consent decree was set to expire, plaintiffs filed a motion for a show cause order and motion to modify the consent decree, seeking an extension); *United States v. City of Fort Pierce*, No. 08-14309-CIV, 2011 U.S. Dist. LEXIS 163401, at *2 (S.D. Fla. July 11, 2011) (on Nov. 9, 2010, plaintiff moved for extension of the consent decree, which was set to be "administratively dismissed with prejudice" on Dec. 14, 2010); *Forry v. Federated Fin. Servs.*, No. 01-7089-CIV, 2007 U.S. Dist. LEXIS 105266, at *4 (S.D. Fla. Dec. 5, 2007) (on Aug. 3, 2007, plaintiff moved for extension of the consent decree, which was set to expire on Aug. 4, 2007).

[63] Although there are a total of eleven components of the 2018 Order, four components, namely, Sections VI, VIII, X, and XI, are statements of policy.

APD Zone verifying that all Citizen Complaints made at any APD Facility under his or her command, have been recorded." (Doc. 492 at 8-9.)

Plaintiffs have not carried their burden of demonstrating the requisite "significant" change in law or circumstances to warrant an extension of the 2018 Order in toto or that the discrete issues with citizen complaints—largely arising from database limitations and paperwork processing issues that have been remediated—have thwarted the "basic purpose of the original consent decree." *See Holland*, 246 F.3d at 281-84, 286 (holding that the district court's extension of the entire consent decree "cannot be justified as a valid exercise of the court's compliance enforcement power, because the court's very limited findings did not show that extending the whole [d]ecree was necessary to remedy the violation and thus provide the parties with what they originally bargained for"); *see also, e.g.*, *Jacksonville Branch, N.A.A.C.P*, 978 F.2d at 1582 (holding that the district court did not abuse its discretion in denying plaintiff's request for modification of the consent agreement to require defendant to implement a "controlled choice" elementary program in furtherance of the agreement's desegregation objectives because plaintiff failed to demonstrate the existence of any of the situations set forth in *Rufo* in which modification might be warranted).

The 2018 Order included a "Statement" of the parties' intent in reaching agreement—"to ensure both public safety and respect for citizens' constitutional

rights." (Doc. 434 at 17.)  The City takes allegations of employee misconduct very seriously, which the rigor of its process, content of its investigative files, statistics of sustained charges, and Declaration of the Chief of Police bear out.[64]  APD and OPS make every effort to systematically inquire into such allegations, gain consensus on appropriate action, and provide the necessary due process to the subject employee *and* complainant—all within 180 days—but the City has not met that negotiated deadline in every circumstance.  Although citizen complaint closure and related reporting for purposes of monitoring are important and necessary, they account for one component of multi-faceted and widespread reform that grew out of gross misconduct during a raid more than a decade ago.

The City has taken the steps necessary and in good faith to modernize its citizen complaint process, infrastructure, and oversight, although such efforts have proven to be a "series of experiments" with trial and error.  *See Reynolds*, 338 F.3d at 1230.  After the rollout of the digital platform as planned in January, the City still will have at least ten months to continue improving its processes and demonstrate to this Court that it fully understands, has communicated, and has built a better and more reliable system around the citizen complaint requirements.  Extending the 2018 Order for three years beyond November 2024 is not a "suitably tailored" solution to the City's admitted—and corrected—errors.  The City respectfully requests that the

---

[64] Ex. A, ¶¶ 13-32; Ex. C, ¶¶ 4, 6, 10.

Court decline to impose such a requirement. *See Peery*, 977 F.3d at 1073-75 (granting a competing motion to terminate a 20-year-plus consent decree relating to the City's treatment of the homeless and denying a motion for contempt for "systemic" violations, finding the City had substantially complied considering "the totality of the circumstances" and the alleged violations were not significant enough to "undermine the consent decree's objectives," and emphasizing that the district court "correctly focused its analysis on [defendant's] 2018 actions to determine whether it was *then* in substantial compliance" because "[w]hat matters is whether [defendant] is '*now* in compliance . . . , and whether it is committed to remaining in compliance") (emphasis added) (internal quotation and citation omitted); *see also Barnett*, 2023 U.S. Dist. LEXIS 87333, at *5-6, *15, *17, *19 (finding the defendant did not fully comply with certain provisions of a consent decree and subsequent enforcement order, but declining to hold the defendant in contempt because the defendant made "good faith, reasonable efforts" "given the challenges" posed, "bolstered by evidence of Defendant's substantial compliance with other terms" of the consent decree and order).

## CONCLUSION

For the reasons stated herein, the City respectfully requests that this Court decline to adopt Plaintiffs' Report To Court Re Citizen Complaint Sanctions (Doc. 515). In the alternative, the City asks the Court to allocate any sanctions imposed to

the remedial measures discussed herein or to impose a sanctions cap consistent with

the level of sanctions previously imposed by this Court and legal precedent in this

jurisdiction, and other reasonable reductions, to preserve critical public financial

resources.

Respectfully submitted this 28th day of November 2023.

*/s/ Tiffany N. Bracewell*
Thomas E. Reilly, GA Bar No. 600195
tom.reilly@troutman.com
Tiffany N. Bracewell, GA Bar No. 377084
tiffany.bracewell@troutman.com
**Troutman Pepper Hamilton Sanders LLP**
600 Peachtree Street, NE, Suite 3000
Atlanta, GA 30308
Tel: 404.885.3000
Fax: 404.885.3900

*Counsel for Defendant City of Atlanta*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **GEOFFREY CALHOUN, et al.** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )  **Case No. 1:09-CV-3286-TCB** |
| | ) |
| **RICHARD PENNINGTON, et al.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## FONT CERTIFICATION

Pursuant to Local Rule 7.1(D), the undersigned counsel certifies that this

filing complies with the type and font requirements set forth in Local Rule 5.1.

Respectfully submitted this 28th day of November 2023.

*/s/ Tiffany N. Bracewell*
Tiffany N. Bracewell

46

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **GEOFFREY CALHOUN, et al.** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Case No. 1:09-CV-3286-TCB** |
| | ) |
| **RICHARD PENNINGTON, et al.** | ) |
| | ) |
| **Defendants.** | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2023, I served the foregoing *DEFENDANT'S RESPONSE TO PLAINTIFFS' REPORT TO COURT RE CITIZEN COMPLAINT SANCTIONS* on all counsel of record in this matter via this Court's CM/ECF e-filing system.

Respectfully submitted this 28th day of November 2023.

*/s/ Tiffany N. Bracewell*
Tiffany N. Bracewell