# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **GEOFFREY CALHOUN, et al.** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | Case No. 1:09-CV-3286-TCB |
| ) | |
| **RICHARD PENNINGTON, et al.** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## DECLARATION OF LIEUTENANT JUSTINA COLLINS

1.  My name is Lieutenant Justina Collins. I voluntarily and freely make this Declaration of my own personal knowledge and in my role as a Lieutenant of the Atlanta Police Department ("APD" or the "Department") Office of Professional Standards ("OPS"), for use as evidence in this case. I am over the age of twenty-one years, am not suffering from any legal disability, and am competent and authorized to make this Declaration and testify to the statements and facts contained herein.

2.  I have served as an OPS Lieutenant since September 2020 through the date of this Declaration. I was promoted to Lieutenant in 2019 and assigned to Zone 5 morning watching. Prior to this role, from 2014 to 2019, I served as a Sergeant for evening watch in Zone 5 and later I was a Sergeant assigned to the Gun Assault unit. I started my career with the Department in October 2007.

1

3. I have been directly involved in the APD's *Calhoun* compliance efforts since September 2020. Specifically, my role and responsibilities include direct supervision of the OPS personnel conducting investigations into employee misconduct.

4. Apart from my *Calhoun*-related responsibilities, on a day-to-day basis I also am responsible for approving sergeant-led investigations; writing dispositions for investigator-led investigations; responding to officer-involved shootings; supporting OPS Open Records Unit personnel; managing day-to-day functions within OPS's office; and responding to questions from APD employees outside of OPS.

### *Development and Implementation of the Axon System*

5. I also have taken the lead on efforts to modernize and digitize the Department's complaints and standards infrastructure. OPS's current system, IA Pro, has been in place since approximately 2005 and only is available to OPS; employees in the field cannot interface with it and thus transmission of relevant information occurs by e-mail or interoffice mail. If documents initiating investigations in the field or disposing of field investigations are sent by e-mail, they must be printed for wet-ink signoff, which may or may not be readily accessible.

6. Further, OPS's current processes are predominantly manual and paper based. Such tasks include data entry, form creation, approval sign-off, status and

approval tracking, file and page numbering, and file maintenance/storage. The many forms that populate a citizen complaint file and that may require wet-ink signatures are reflected in **Exhibit B-1**.

7. My understanding is that APD's iteration of IA Pro was an off-the-shelf solution; it is not tailored to APD's and OPS's needs. IA Pro does not have fields that align both with the reporting needs of the Department *and* for *Calhoun*. For instance, OPS cannot input a "complaint made" date and a "file opened" date, or an "adjudication date" and a "notification date." Rather, IA Pro relies heavily on free text inputs rather than rigid data fields. OPS has learned that this structure has resulted in inconsistent field interpretation and data entry over the years, with continued reliance on paper files.

8. Relatedly, there are system output limitations from IA Pro. For example, if any charge within a file is Sustained, the entire file will be marked Sustained, possibly giving the appearance of contradiction or inaccuracy in reporting without additional context.

9. The COVID-19 pandemic prompted APD to focus additional effort on transitioning away from a paper system. After exploring solutions with various companies, in late March 2023, APD received authorization through legislation approved by the City Council to retain Axon Enterprises, Inc. ("Axon") to develop, among other services for APD more broadly, an electronic platform specifically

tailored to OPS's needs that will (i) centralize recordkeeping in electronic format for all methods of citizen complaints; (ii) ensure all methods of complaint reporting capture the same information; (iii) allow OPS, the field investigators, and APD supervisors to access the system; (iv) allow for live status updates without the need for calling or e-mailing the field officers; and (v) eliminate manual tracking, reporting, and file creation. The City previously worked with Axon in implementing systems around the use of Body Worn Cameras ("BWC") and fleet cameras for law enforcement interactions with the public, and Axon also is the interface for all Use of Force reporting.

10. In furtherance of this effort, I typically meet with Axon a couple of times each week, which occasionally are full-day sessions.

11. APD's goals in developing the complaint and standards system with Axon are to (i) eliminate the guesswork for employees in the investigatory and approval chains by standardizing the information required and providing dropdowns to ensure information is cited and categorized uniformly; (ii) have a highly searchable system, including for reporting out in matters like *Calhoun*, and for evaluating trends; and (iii) house in one place the "meat and potatoes" of investigations, like documents and other evidence. Data from IA Pro also will be integrated.

12. APD plans to commence (i) online training, and (ii) in-person sessions with the Axon team for all sworn supervisors (rank of Sergeant and above) and civilian supervisors in mid- to late December. As noted, APD already has implemented Axon's system for Use of Force reporting, and the expectation is that this familiarly will allow for a smoother transition.

13. APD plans to first implement the Axon tool for processing and tracking internal Department complaints in approximately December 2023.

14. APD plans to implement the tool for processing and tracking citizen complaints in approximately January 2024. Given the importance of citizen complaints, the January implementation is contingent upon the successful rollout of the system for internal Department complaints in December. This is a testing phase; errors and/or improvements may be identified that must be remediated before implementing the system for citizen complaints.

*Development and Implementation of the New Disposition Letter*

15. On or around June 8, 2023, I led the development of a form Notification Letter to ensure consistency of information provided to complainants and compliance with the Court's March 1, 2023 Order, which defined the reporting requirements for final adjudication.

16. Specifically, I mapped the information from the Court's Order and some of the information in existing templates into a table and populated the table

5

with dropdowns to make it easier for OPS to prepare.  A sample letter using the new template is attached as **Exhibit B-2**.

17. The use of the new form Notification Letter was approved the same day and replaced multiple templates in use for more than a decade.  I provided the approved template to OPS's Advocacy Unit and File Room Personnel for implementation.

18. In my experience, OPS historically has not included policies ("standard operating procedures" or "SOPs") or other directives, rules, or regulations in defining violations that are listed in Notification Letters, and I did not build them into the new template for a couple reasons.

19. First, the functionality and utility of a dropdown menu including all APD Work Rules, SOPs, ordinances, etc. would be limited due to the sheer number of selection options required.

20. Second, it often is the case that what a complainant believes are the charges and what the actual *charges* are under APD's rubric and available evidence differ.  Development of an investigative plan and charges (from hundreds of Work Rules, ordinances, SOPs, etc.) requires the subjective judgment of the employee processing and investigating the matter.

21. For instance, a citizen may make a complaint regarding "excessive force," but no physical force was used, or the force used to affect the arrest was

within policy.  Upon review, OPS may identify a different policy concern and decide to open the file for investigation of conduct outside the four corners of the citizen's original complaint, like the employee may have violated another portion of APD.SOP.3010 Use of Force due to reporting or notification requirements.  Here, OPS must determine the most appropriate Work Rule or expanded policy to cite.  In this instance, the Work Rule investigated would be 4.2.33 Conformance to Directives (APD.SOP.3010 Use of Force).  There are more than 50 sub-parts to APD.SOP.3010, organized by one- to three-digit sections (e.g., APD.SOP.2010 (3) is "Responsibilities" and APD.SOP.2010 (4.1.1) is "Action – "Use of Force Generally," followed by a statement that officers will strive to use de-escalation techniques to utilize the least amount of force necessary).

22. Although in some cases there is direct logic between a policy and a Work Rule, in many cases there is none (e.g., wearing a body worn camera is not a Work Rule).  On the other end of the spectrum, there may be significant overlap in policies such that more than one SOP and Work Rule could apply or be appropriately cited (e.g., Work Rule 4.2.21 (Submitting Reports), Work Rule 4.6.10 (Reporting Discharge of Firearm), Work Rule 4.2.33 (Conformance to Directives – APD.SOP.3010 Use of Force (Reporting Requirements)), and Work Rule 4.2.33 (Conformance to Directives – APD.SOP.3060 (Reports and Writing Reports)).

23. OPS has started to include information regarding the underlying policy violation in Notification Letters, but it is a manual process requiring study of the full file. The source for such information may differ between a complaint investigated by OPS versus the field, though OPS typically includes the relevant underlying directive, policy, rule, regulations, etc. on its File Closeout Report form.

24. Based on my experience interacting with complainants and the examples above, including additional detail about SOPs likely would not eliminate and may exacerbate confusion. APD is not trying to be confusing, but the standards system is confusing by nature. For this reason, in the Notification Letter, we notify complainants of their right to inspect the file – where they can compare what was *investigated* versus what was *charged* and what was *sustained* – and ask questions to an OPS Lieutenant about the disposition. *See* Exhibit B-2.

25. When the Axon system is implemented, Work Rule 4.2.33 (Conformance to Directives) will require the user to populate the underlying directive, policy, rule, regulations, etc. before disposition can be completed. OPS will be able to draw from such data in Axon, if required by the Court, to include in reporting.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 28, 2023.

_____
Lieutenant Justina Collins

# EXHIBIT B-1

# Office of Professional Standards



Transition from Paper Files to Fully Digitized Format

Axon Standards

# Complaint Process

- The taking/receiving of complaints will remain the same.

- The Documentation Process is changing.

- OPS uses a Response Complaint Summary

- Currently Supervisors in the field are required to complete Form 859 when receiving Citizen Complaints and submit to OPS within 7 days. If we have internal complaints they fill out the 856 or 857.

- The APD 859 is a part of the Calhoun Order from Nov.29th, 2018

- To open ALL investigations the department will use the same form



# Preliminary Forms

- Once OPS receives the opening documents we send out the 822 (Preliminary Complaint Form, 820 Disciplinary Index, and the 855 OPS File Tracking

# To Complete the Investigation

Investigators (OPS) and Supervisors (Department wide) complete the following forms to complete the investigation and gather all supporting documentation

# Findings

- Supervisors in the field complete their findings on a disposition form and OPS completes Memos to show their findings



# Discipline

- Discipline is determined by the Chain of Command

# EXHIBIT B-2



CITY OF ATLANTA

Andre Dickens
Mayor

226 Peachtree Street, S
Atlanta, Georgia 30303
(404) 546-6900

June 22, 2023

**Daniela Provo**

RE:  23-C-0267-SOP
Dear  Daniela Provo,

Thank you for taking the time to express your concerns regarding the actions of Officer Tylief Josey.

The findings for each allegation are below:

| Employee Name | | Disposition | Rule | Discipline Issued |
|---|---|---|---|---|
| Officer | Tylief Josey | Sustained | 2.33 Conformance to Directives(2060 Extra Jobs) | Written Repremand |

| Definition of Findings: | | | | |
|---|---|---|---|---|
| Unfound | Exonerated | Exceptionally Closed | Not Sustained | Sustained |
| Complainant admits to false allegation, the charge is false or not factual, or the accused employee was not involved in the incident. | The incident occurred but the employee's actions were justified, lawful, and proper. | Reasons outside the Department's control prevent it from continuing or completing its investigation of a complaint, and/or from charging and prosecuting an accused employee when sufficient evidence exists to charge the accused employee. Examples may include: the employee resigns, dies, or is no longer employed by the Department. | There is insufficient evidence to sustain a finding that the employee committed the violation. | The investigative file provides sufficient evidence to support the finding that the employee committed the violation. **If found sustained, the appropriate corrective actions have been taken against the employee.** |

This file will be available for your inspection, by **APPOINTMENT ONLY**, for a period of twenty-five (25) days at the Office of Professional Standards.

Thank you for bringing this matter to our attention and your continued interest in the Atlanta Police Department. If you have any questions concerning this complaint, please contact Lt. Burks (404)546-5945.

Sincerely,

Major C. Peek, Commander
Office of Professional Standards

CP/gac