## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

_____

|  |  |  |
|---|---|---|
| GEOFFREY CALHOUN, et al. | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action |
| v. | ) | File No. 1:09-CV-3286-TCB |
| | ) | |
| RICHARD PENNINGTON, et al. | ) | |
| | ) | |
| Defendants. | ) | |

_____

## (CORRECTED AND SUBSTITUTED) PLAINTIFFS' REPLY TO DOC. 523 (DEFENDANT'S RESPONSE TO PLAINTIFFS' REPORT TO THE COURT RE CITIZEN COMPLAINT SANCTIONS)

# <u>TABLE OF CONTENTS</u>

**<u>I.   DETERMINATON OF THE AMOUNT OF SANCTION</u>** ..............................1

   **<u>A.   The sanction amount should be designed to get the attention of the City's political leadership, and to encourage them to demand that City employees comply with all aspects of the Calhoun Orders.</u>** ...................................1

   **<u>B.   Plaintiffs do not know how large a sanction would be required to motivate the City's political leadership, but history shows the amounts that have not gotten their attention</u>** ..................................................................1

   **<u>C.   Effect of Sanctions on APD and ACRB Budget</u>** ..............................4

**II.   THE CITY'S THREE PROPOSED LESSER SANCTIONS** ..........................7

**A.   The City proposes no sanction at all** ..................................................7

**B.   The City proposes reduced sanctions** .................................................8

   **<u>1.   The City's proposed forgiveness of Citizen Complaints resolved fewer than 25 days late</u>** ..........................................................................9

   **<u>2.   The City's proposes forgiveness of the sanction for duplicate items of inaccurate information</u>** ...................................................................10

   **<u>C.   The City's proposed downward adjustment of sanctions for specific Citizen Complaints</u>** ......................................................................................12

   **D.   Upward adjustments for Specific Complaints based on new information received by Plaintiffs** ...................................................................................13

**III.   THE CITY'S POOR COMPLIANCE ATTITUDE SUGGESTS THE NEED FOR A SUBSTANTIAL SANCTION** .......................................................................14

**A.  Consider the efforts that were required to get the City to begin taking steps to improve Citizen Complaint compliance** .................................................14

**B. The City's Response indicated that the City intends to continue violating the Court's Orders with regard to Citizen Complaints by not investigating certain complaints, and by notifying Complainants only of a meaningless and unspecific "Conformance to Directives" disposition**…………………………………………………………………….…………..17

**IV.   CITIZEN COMPLAINTS ARE NOT ONLY AREA OF LONGSTANDING NON-COMPLIANCE**.................................................27

**A.  Stop and Think Non-Compliance**....................................................29

**V.   EXTENSION OF MONITORING SUNSET** ....................................................35

**A.  The Burden and Cost of Monitoring Will be Minimal if the City Chooses to Comply with the Order**........................................................36

**B.  Extending the sunset is necessary to achive the results promised by the settlement** ................................................................................39

**VI.   CONCLUSION** ................................................................................40

## I.     <u>DETERMINATION OF THE AMOUNT OF SANCTION</u>

### A.     The sanction amount should be designed to get the attention of the City's political leadership, and to encourage them to demand that City employees comply with *all* aspects of the Calhoun Orders.

The sanction imposed by this Court should be in an amount that finally gets the attention of the political leadership of Atlanta (the mayor and City Council), who are the only people with the power to change the attitude and decisions of the Law Department and APD employees necessary to assure compliance. And the sanction should be designed not merely to punish the City for past violations regarding Citizen Complaints, but to encourage the City's future and continuing compliance with *all* aspects of the Court's Orders, and perhaps avoid the need for future contempt litigation over the City's non-compliance with obligations beyond just Citizen Complaints.[1]

### B.     Plaintiffs do not know how large a sanction would be required to motivate the City's political leadership, but history shows the amounts that have *not* gotten their attention

While Plaintiffs have calculated the range of sanctions applicable under the March 1, 2023 Order (Doc. 492) as instructed by this Court, Plaintiffs do not pretend to know what specific amount will be required to get the attention of the City's political leadership. But history shows the amounts that have *not* gotten their attention.

---

[1] See discussion of other areas of non-compliance, *infra* at 27-35.

Over the past twelve years the City's failure to comply with numerous Court Orders, coupled with the City's litigious and adversarial approach to the Plaintiffs' attempts to prompt compliance, has caused the City to spend *well* more than a million dollars in legal fees paid to Plaintiffs, a Special Master, and several outside law firms representing the City, to say nothing of the City's internal legal expenses along with various sanctions over the years.  Yet, those costs have not proved sufficient to prompt the City's political leadership to instruct the City of Atlanta Law Department and Police Department to take compliance seriously.

If the past twelve years of compliance battles have shown anything, it is the City's willingness to spend tax dollars fighting compliance rather than embracing it, and one can look no further than the City's approach to the Citizen Complaint issues in this very proceeding to witness the City's inexplicable willingness to absorb avoidable costs rather than simply comply with clear obligations. Had the City begun complying with these obligations in 2019 – or 2020, or 2021, or even early 2022 – the costs flowing from the present contempt proceeding, starting with Plaintiffs' August 14, 2022 Motion for Contempt (Doc 473), could all have been avoided.

Indeed, the City's willingness to spend tax dollars fighting with Plaintiffs rather than complying with Court Orders has been the hallmark of the City's approach over the past twelve years. For example, after having been found more

2

than once to have violated its obligations or to be in contempt between 2011 and 2015 (see Docs. 279, 280, 287, 289) and then confronted with additional evidence of non-compliance in 2016, the City could have worked cooperatively and inexpensively to remedy the problems. Instead, the City insisted upon the appointment of a Special Master at the City's expense. Not only did the City pay Joe D. Whitley and his firm over $600,000 for his services[2], but the City paid an additional $308,251.98 to outside counsel Bruce Brown to represent the City in opposition[3]; and yet despite this great expense and Mr. Whitley's best and patient efforts to encourage compliance, the result of that lengthy and expensive exercise was not compliance but rather the City's continued resistance, resulting in two Orders in July, 2017 (Docs. 347 and 348) for the City to Show Cause why it should not be held in contempt, after which the City engaged in still additional expensive  litigation to have Mr. Whitley removed as Special Master because the City did not like his findings (Docs. 375, 376).

The City could have saved over a million dollars, yet even that cost did not persuade the City to embrace compliance. Within weeks of consenting to a new 2018 Court Order the City was *again* in non-compliance, as documented by the

---

[2] City Of Atlanta's Emergency Motion to Suspend Special Master Activity, Doc 376 at 3.

[3] Information from Atlanta "Open Checkbook" website: https://checkbook.atlantaga.gov/#!/year/All Years/explore/0-/vendor name/BRUCE+P.+BROWN+LAW+LLC/

Compliance Memos sent to the City by Plaintiffs' counsel in early 2019 (Exhibits A, B, C) and, eventually, this contempt proceeding three years later.

Clearly, the massive amounts of money that the City has spent fighting compliance, rather than engaging in it, have proved insufficient to grab the attention of the Atlanta City Council and three separate mayors, which is perhaps understandable in light of the City of Atlanta's $2.5 billion annual operating budget.[4] A wake-up is needed in the form of sanctions meaningful enough to cause the City's political leadership to demand that City employees change their attitude toward compliance.

### C.    Effect of Sanctions on APD and ACRB Budget

Given the large size of the financial "wake up call" that will be needed to get the attention of the City's political leadership, Plaintiffs need to address the City's argument that the imposition of contempt sanctions according to the known formulae established by this Court's 3/1/2023 Order would adversely impact the Atlanta Police Department and/or the Atlanta Citizen Review Board (ACRB). City Response (Doc. 523) at 27-28. Indeed, the City has suggested that (1) training, (2) recruitment, and (3) the Atlanta Citizen Review Board would be targeted for budget reductions because the funds to pay sanctions would come out of the police budget.

---

[4] Declaration of City of Atlanta Chief Financial Officer Mohamed Balla, City Response Exhibit D (Doc. 523-4) ¶ 3.

Because no-one wants public safety to be compromised by the imposition of a contempt sanction, this argument seems persuasive on its face. But it is **false**: The Declarations offered by the City of Atlanta about the potential effect of sanctions were disingenuous at best – and dishonest at worst – in suggesting that sanctions would impact the budgets of the Atlanta Police Department and/or the Atlanta Citizen Review Board.

City of Atlanta CFO Mohamed Balla testified in his Declaration that if the full sanctions due under the Court's March 1, 2023 Order were imposed on the City "three areas of the budget likely would absorb the cost of sanctions: (1) Police Training; (2) Police Background and Recruitment; and (3) the Atlanta Citizen Review Board." Balla Decl., City Response Exhibit D (Doc. 523-4) ¶ 5.

But while Balla testified (apparently untruthfully) that this is "likely," the actual history of how the City of Atlanta has paid costs arising from misconduct by the Atlanta Police Department suggests the exact opposite. Over the past ten years the City of Atlanta has made at least 77 payments totaling at least $14,604,557.35 as the result of an act or omission by the APD or its officers, and every dollar of that amount has been paid from the City of Atlanta's General Fund; not a single dollar was taken from the Atlanta Police Department's budget. Declaration of Beckie Spencer, ¶ 4, Exhibit D. Those payments had no financial impact at all on the operations of the police department, let alone on specific

areas such "Police Training" or "Police Background and Recruitment" as CFO Balla threateningly but misleadingly suggests.

But while CFO Balla testified that it is only "*likely*" that sanctions would impact the APD and ACRB, Atlanta Police Chief Darin Schierbaum took things a step further when he testified unequivocally: "If the Court were to impose $5 million or more in sanctions as I understand Plaintiffs have requested, *this would necessarily* reduce the amount of funds available to the Department for training and other initiatives." Schierbaum Decl., City Response Exhibit C (Doc. 523-3) ¶ 11 (emphasis added). This testimony is simply untruthful: Sanctions would reduce the funds available to APD only if the City Council *chooses* to do that, and such a decision is not in any way a "necessary" result of the imposition of sanctions.

CFO Balla's reference to financial harm to the Atlanta Citizen Review Board (ACRB) is even more disingenuous. The ACRB is an independent City agency, completely separate from APD, and the ACRB has no control over how the APD handles Citizen Complaints. The ACRB has done *absolutely nothing wrong* in connection with the City's failure to comply with its Citizen Complaint obligations. The ACRB has no conceivable responsibility for these failures and it would make about as much sense for the Atlanta City Council to punish the ACRB for these failures as it would make sense to punish the Department of Parks and Recreation. There is simply no reason to think that sanctions in the

*Calhoun* case would be paid from the ACRB budget, and indeed it would seem inconceivable (and politically indefensible) for the Atlanta City Council to choose to do that.

The truth is that imposition of contempt sanctions by this Court would financially impact the APD only if the City chooses to take those funds from the APD budget, and while the City *could* choose to harm public safety because of the misconduct of a few City officials, that would be a *choice* made by the City and not anything requested by the Plaintiffs or required by this Court. For high-ranking City officials to testify that sanctions in this contempt proceeding would directly harm the Atlanta Police Department's ability to train or recruit officers, or limit the Atlanta Citizen Review Board's ability to conduct its business, is not only manipulative but comes close to the line, if not crossing the line, of actively misleading the Court.

## II.     THE CITY'S THREE PROPOSED LESSER SANCTIONS

### A.     The City proposes no sanction at all

The first proposal in the City's Response is that the Court impose no sanction at all. City Response (Doc. 523) at 28. Instead, the City asks the Court to waive the sanction and trust that the City will use those funds to pay for compliance. *Id*. But the City and the Plaintiffs have already tried that idea, and it didn't work.

In 2017 Special Master Joe D. Whitley recommended Show Cause hearings for the City's failure to comply with its obligations under the 2010 Court Order. The Plaintiffs could have insisted that those hearings take place and encouraged the Court to impose painful financial sanctions. But Plaintiffs were interested in future compliance rather than punishment for past misconduct, and Plaintiffs did not want to see Atlanta tax dollars used to pay a fine when they could be used to support compliance. So, Plaintiffs agreed *not* to seek sanctions in return for the City's consent to the 2018 Court Order, which created mechanisms for monitoring and required monthly information disclosures by the City. But the inherent bargain behind the November 29, 2018 Court Order – the Plaintiffs' willingness to forego financial sanctions in return for the City's promise to do better – never panned out. The City avoided financial sanctions in 2018 in return for a promise to do better in the future; that compliance never happened but the City now asks for that same trust again.  The City has not earned that trust.

### B.    The City proposes reduced sanctions

The second proposal in the City's Response is that the Court reduce the sanctions payable under the Court's March 1, 2023 Order to a lowered amount of $1.142 million to $1.742 million. City Response (Doc. 523) at 29-32. In support of this proposal the City has suggested conceptual methods of re-calculating the amount of sanctions, but the specific re-calculations suggested by the City – while creative – do not have solid logical or factual bases. It is also notable that

the City has not refuted, in any way, that Citizen Complaints for which no accurate and compliant Notification Letter was ever sent to the Complainants remained open at the time of Plaintiffs' Report.

        1.    **The City proposes forgiveness of Citizen Complaints resolved fewer than 25 days late**

The City proposes that it be excused from sanctions where Citizen Complaints were closed after the deadline set by the Court by fewer than 25 days, because the Court ruled that Citizen Complaints that exceed the 180 Day Rule by more than 25 days would *not* be in substantial compliance. See, City Response (Doc. 523) at 30.

The City has flipped the Court's order and its logic on its head. The notion that a Citizen Complaint that is more than 25 days late is *not* in substantial compliance with the 180 Day Rule does not imply that any Citizen Complaint that is late by *fewer* than 25 days *is* in compliance. To the contrary, while the Court noted that it "will not at this time set specific numerical requirements by which the City's compliance will be measured… *full compliance is ultimately expected.*" 3/1/2023 Court Order (Doc. 492) at 3 (emphasis added). The Court's 25-day substantial compliance guideline simply did not create a safe harbor that effectively converts the 180 Day Rule into a 205 Day Rule.

But far more importantly, the City has taken the Court's 25-day guideline out of context. That guideline applies to the resolution of *future* Citizen

Complaints, and was intended to set a boundary on the City's ability to argue that very late Citizen Complaints could nevertheless constitute substantial compliance. That guideline did not extend by 25 days the very specific deadlines in the March 1, 2023 sanctions order. Had the City believed those deadlines to be unfair, unrealistic, or impossible to achieve, the City could have sought reconsideration or appealed. Instead, the City chose to accept these deadlines but ignore them.

### 2. The City proposes forgiveness of the sanction for duplicate items of inaccurate information

The City also seeks relief from the imposition of the sanction of $1,000 "per item" of inaccurate information by claiming that "the Court did not envision that a single inaccurate piece of information from one of these four categories—listed several times due to a database error—would result in exponential sanctions." City Response (Doc. 523) at 15-16.

In fact, this very issues was before the Court, since Plaintiffs highlighted the issue in this contempt proceeding: Plaintiffs' Response to the City's 1/18/2023 Status Report (Doc. 485) complained that the City's spreadsheet "records the same OPS file numbers multiple times (as if each were a separate Complaint)," and Plaintiffs even attached an exhibit to that filing to illustrate this very problem: a copy of a City spreadsheet in "which each duplicate entry is

10

highlighted in blue (Exhibit B)."[5] The City's provision of duplicate inaccurate information was one of the many specific issues underlying the Court's March 1, 2023 Sanctions Order – including the imposition of a coercive sanction of $1,000 for each item of inaccurate information provided in the future, and it is reasonable to assume that the deterrence of that very type of misconduct was one of the specific purposes of the $1,000 per item coercive sanction, because accurate information is essential.

But perhaps more importantly, the City can hardly pretend that *it* could not envision that repeating inaccurate information multiple times would result in multiple sanctions, because the problem of duplicate inaccurate information was well known to the City long before it submitted spreadsheets after the Court's March 1, 2023 Order.

The City has long been aware of the problem of duplicate inaccurate entries. Plaintiffs' first brought this issue to the City's attention almost five years ago; the Plaintiffs' Compliance Memo of April 23, 2019 contained screen shots showing the specific problem of duplicate rows of inaccurate information, and included the Plaintiffs' very specific request that "all future spreadsheets, contain only accurate information, *with one row for each discrete violation investigated by APD*." Exhibit B,  Plaintiffs' 4/23/2019 Compliance Memo to City of Atlanta, pp.

---

[5] Plaintiffs' Response to the City of Atlanta's January 18, 2023 Status Report to the Court (Doc. 485) p. 4 and Exhibit B thereto (Doc. 485-2).

3-8 (emphasis added). On notice, the City still continued to send Plaintiffs spreadsheets with duplicate rows of information. Plaintiffs continued to "encourage the City to provide a spreadsheet…that contains accurate *and non-duplicative* entries." Exhibit C, Plaintiffs' 5/29/2019 Compliance Memo to City of Atlanta, pp. 2-3 (emphasis added). And on February 11, 2021, Plaintiffs *again* pointed out this problem in a Memo containing 18 pages of screenshots and examples of duplicate instances of inaccurate information. Exhibit I, Plaintiffs 2/11/2021 Letter to City Counsel, pp 6-26.

The City was on repeated notice not to present duplicative inaccurate data because it makes monitoring compliance not only more difficult but more expensive. It is simply not credible for the City to claim any surprise about a sanction for doing yet again the very thing it was told not to do, and these sanctions are important to ensure that the City provides accurate and non-duplicative information in the future.

### C.    The City's proposed downward adjustment of sanctions for specific Citizen Complaints

The City has requested downward adjustments of the sanction for the following specific Citizen Complaints.  Exhibit E explains Plaintiffs' detailed response to each specific complaint, which are summarized below:

- OPS File 22-C-0326-SOP (Complainant Pierre Lamartiniere) :
  Plaintiffs will take the exhibit produced by the City at face value and stipulate that the sanction for this Citizen Complaint should be the $77,000 claimed by the City.

- <u>OPS File No, 21-C-01999-CTSY (Complainant Quadedra Favors):</u>
  Plaintiffs asked the Complainant if she received the email attached as an exhibit to the City's Response and she replied: "I haven't gotten anything."

**D.    Upward adjustments for specific Citizen Complaints based on new information received by Plaintiffs**

The following *upward* adjustments are appropriate for some Citizen Complaints about which Plaintiffs received new information after filing their sanctions calculation Report to the Court. Exhibit F contains a detailed explanation for each.

- <u>OPS File 23-C-100-CTSY (Complainant Sherica Harper):</u>
  Plaintiffs recently received a communication from this Complainant indicating that she actually received the City's letter on October 5, 2023, 242 days after the date of the complaint, triggering a sanction of $62,000 rather than the 0 sanction presented in Plaintiffs' Report.

- <u>OPS File 22-C-0465-MISC (Complainant Margaret Kimbrough):</u>
  Plaintiffs later received a communication from this Complainant indicating that she actually received the notification email from the City on June 28, 2023, 196 days after the date of the complaint, triggering a sanction of $16,000 rather than the 0 sanction presented in Plaintiffs' Report.

- <u>Additional $25,000 Sanction for Failure to Report Command Complaint:</u>
  Records produced by the City just two weeks ago, on January 15, 2024, reveal a complaint made to the Atlanta police precinct in Buckhead (Zone 2) on May 13, 2023 that was not reported the following month as required, triggering an additional $25,000 sanction of which Plaintiffs were unaware at the time of Plaintiffs sanctions calculation Report.

### III.   THE CITY'S POOR COMPLIANCE ATTITUDE SUGGESTS THE NEED FOR A SUBSTANTIAL SANCTION

The need for a meaningful and effective sanction is suggested by the persistence, determination, and consistency of the City's resistance to compliance. The City's very recent (and not fully effective, as discussed *infra* at footnote 6) attempts to improve compliance after being caught red-handed in non-compliance do not erase a long history of resistance toward compliance. ***And even now the City insists that it will continue to violate its Citizen Complaint obligations*** (discussed *infra* at 17-26).

### A.   Consider the efforts that were required to get the City to begin taking steps to improve Citizen Complaint compliance

While the City's Response puts great emphasis on the remedial steps it belatedly took with regard to Citizen Complaints in June 2023, consider the time, effort, trouble, and expense that was required to get the City to begin to take concrete steps to address its years-long failure to comply with the Citizen Complaint requirements:

- 2019 – Plaintiffs brought Citizen Complaint non-compliance to the City's attention through a series of Compliance Memos, Letters, and emails during 2019, yet that was not sufficient to get the City to take meaningful steps. See, e.g., Exhibits A, B, C.

- 2020 – Plaintiffs brought Citizen Complaint non-compliance to the City's attention during 2020, yet that was not sufficient to get the City to take meaningful steps. E.g., Exhibit G.

14

- 2021 – Plaintiffs brought Citizen Complaint non-compliance to the City's attention during 2021, yet that was not sufficient to get the City to take meaningful steps. See, e.g, Exhibit I.

- January, 6, 2022 – Plaintiffs sent the City a 16-page Memo detailing the City's non-compliance regarding Citizen Complaints, yet that was not sufficient to get the City to take meaningful steps. Exhibit J.

- May 26, 2022 - Plaintiffs sent the City a detailed Memo detailing the City's continued non-compliance regarding Citizen Complaints, yet that was not sufficient to get the City to take meaningful steps. Exhibit K.

- August 14, 2022 – Plaintiffs filed Motion for Contempt on August 14, 2022 (Doc. 473), yet that was not sufficient to get the City to take meaningful steps.

- September 20, 2022 – The Court found the City to be non-compliant and ordered the City to cure deficiencies within 120 days (Doc. 479) yet that was not sufficient to get the City to take meaningful steps.

- January 23, 2023 – Plaintiffs filed a Second Motion for Contempt (Doc.485), yet that was not sufficient to get the City to take meaningful steps.

- February, 2023 – The Court's Order of February 8, 2023 (Doc. 488) held the City in contempt, yet that was not sufficient to get the City to take meaningful steps.

- March, 2023 – The Court's Order of March 1, 2023 (Doc. 492) ordered the City to close overdue Citizen Complaints within 60 days and imposed coercive sanctions for the failure to do so, *yet even that was not sufficient to get the City to take meaningful steps.*

It was not until June of 2023 – and only after Plaintiffs filed a Motion to Impose Suspended Sanctions on May 31, 2023 (Doc. 496) – that the City began to take steps to comply with the Court's Orders. The City itself notes: "*With the filing of Plaintiffs' May 31, 2023 Motion,* the City immediately sought to ensure that leadership at all levels of APD and OPS understood the precise requirements of

the 2018 Order and subsequent orders of this Court. . ."  City Response (Doc. 523) at 16-17 (emphasis added). That the City did nothing to ensure that APD leadership "understood the precise requirements of the 2018 Order and subsequent orders of this Courts" during 2019, 2020, 2021, 2022, or early 2023 – and indeed not until things reached a truly extreme point – demonstrates in sharp relief the City's attitude toward its compliance obligations.[6]

The City's resistance to compliance was shown also by the City's explicit refusal to work with Plaintiffs to solve the problem.  Plaintiffs suggested in August, 2022 (Doc. 473 at 22) that the City should "work collaboratively with Plaintiffs to develop a remediation plan within a reasonable period of time, such as three months, that is designed to bring the City into compliance with the Citizen Complaint requirement," to which City *could* and *should* have responded,

---

[6] And even with these new efforts, Citizen Complaint compliance still has deficiencies. As just one example, even though Plaintiffs have been complaining since 2019 (Exhibit B, p. 11) that the City's spreadsheets of "RNO" complaints (that is, Citizen Complaints that the APD "Received" but decided to "Not Open") does not contain the date those Citizen Complaints were received, but only the date of the incident – making it impossible to tell from the face of the spreadsheet whether complaints were resolved within 180 days – as recently as the monthly records produced just two weeks ago, on January 15, 2024, the problem persists. Exhibit L. This continuing violation of the explicit requirements of the 2018 Court Order requires Plaintiffs to spend time reading each underlying file to locate complaints, such as RNO-23-435, which took longer than 180 day to close; the Citizen Complaint in RNO File 23-435 was made on May 13, 2023 but not closed until 222 days later, on December 21, 2023. Exhibit F-4.

"Of course we will work with you to remediate the problems we have been having." But instead of agreeing to work with Plaintiffs, the City opposed Plaintiffs' suggestion, offering only an empty promise in its place. The City told the Court that it "fully intends to continue to comply with both the spirit and the letter of the Parties' consent agreement and this Court's 2018 Order" (Doc. 475 at 3) but we now know that the City's promise to the Court was not honored. The City took no steps until almost a year later, and then only when it was facing looming sanctions.

**B.     The City's Response indicates that the City intends to *continue* violating the Court's Orders with regard to Citizen Complaints by not investigating certain complaints, and by notifying Complainants only of a meaningless and unspecific "Conformance to Directives" disposition**

Plaintiffs' Report to the Court pointed out the City's routine failure to investigate and adjudicate certain Citizen Complaints (Doc. 515 at 40-48), but in lieu of financial sanctions for these past failures Plaintiffs proposed a non-punitive, future-looking remedy. Not only did the City's Response reject this remedial proposal, but, even more amazingly, a Declaration filed by a City witness indicates that the City intends to *continue* violating the Court's Orders with regard to certain Citizen Complaints.

The City's failure to investigate and adjudicate, in some cases, *the actual complaint made by the Complainant* has been an ongoing problem that Plaintiffs hoped the present contempt proceeding would resolve. Instead, the City's

opposition to the Plaintiffs' non-punitive remedial proposal, and the specific testimony of one of the City's police lieutenants, indicate that the City intends to continue violating its Citizen Complaint obligations by not investigating the actual complaint made by some complainants.

This issue has two interrelated facets: First, the City appears unwilling to, *in all cases,* investigate and adjudicate the complaint actually made (whether or not it fits neatly within one of APD's internally-adopted Work Rules). Second, the City is unwilling to fully, truthfully, and accurately disclose to Complainants how those investigations were resolved; instead, the City seeks to continue to disclose only that an officer was investigated and/or disciplined for violating APD's "Conformance to Directive" Work Rule without disclosing the nature of the "directive" that the officer was investigated for having violated, so that the Complainant will not know if his or her specific complaint was resolved.

This is not a new problem. For many years, the City insisted that *it* was allowed to decide which complaints it would investigate and adjudicate (and, therefore, which complaints by citizens the City would treat as "Citizen Complaints"). As a result, complaints of police misconduct that the City decided to ignore were *not* investigated and adjudicated.

This problem should have been resolved six years ago by the Court's Order of January 5, 2018, which clarified for the City that the phrase "Citizen Complaint" means "an expression of a wrong suffered, or grievance, resulting

from police misconduct, which is made by a citizen." 1/5/2018 Court Order

(Doc. 401) at 12.

> The Atlanta Police Department shall investigate and finally adjudicate all [expressions of wrong suffered, or grievances, regarding APD] police misconduct made by a citizen regarding police misconduct of any kind within 180 days of the complaint.

1/5/2018 Court Order (Doc. 401) at 21.

For almost six years, therefore, it has been clear that any "expressions of wrong suffered, or grievance" alleged by a citizen must be investigated and adjudicated. In other words, if a citizen complains about excessive force, unlawful arrest, unreasonable search, failure to activate a body worn camera, or anything else, then the citizen's complaint, whatever it may be (i.e., whatever "wrong suffered, or grievance" the Citizen alleged) must be investigated and adjudicated. For example, if a complainant alleges the use of excessive force the APD must investigate *that* complaint – the allegation of excessive force – since that is the wrong suffered or grievance complained about. APD may reach any conclusion it finds appropriate (for example, it may find that no force at all was used, or that the force was lawful) but it must inform the Complainant of *that* finding.

Although the City has known since 2010 that it must "investigate and finally adjudicate *all* citizen complaints of police misconduct of any kind,"[7] the requirement to investigate "all" complaints is something the City has resisted for years.  Even now, the City *is still insisting* that APD is not required to investigate a complaint ("an expression of wrong suffered, or grievance") if that complaint does not fall squarely within the four corners of an APD Work Rule. Indeed, the City goes further – it argues that even a Citizen Complaint alleging the violation of a specific APD SOP does not require adjudication if the SOP does not also neatly correspond to a "Work Rule":

> APD's Disciplinary Process SOP mandates the investigation and imposition of appropriate discipline for all sustained "Work Rules or City ordinance violations," not sustained SOP violations.

City Response (Doc. 523) at 37.

The City seems to think that compliance with the Court Order is not relevant; in the City's view, it need only follow its own unilaterally-adopted Disciplinary Process SOP, which it can design and interpret as it sees fit. But the issue here is whether the City is complying with *the Court Order*, which requires the APD to "investigate and finally adjudicate all [expressions of wrong suffered, or grievances, regarding APD] police misconduct."

---

[7] The same language and obligation is found in both the December 8, 2010 (Doc. 265) and November 29, 2018 (Doc. 434) Court Orders.

The City's position leads to bizarre and non-compliant situations. According to OPS Lieutenant Justina Collins, OPS will sometimes not investigate the complaint actually made by the Complainant, but instead choose to ignore that specific complaint and "open the file for investigation of conduct outside the four corners of the citizen's original complaint." Collins Decl., City Response Exhibit B (Doc. 523-2) ¶ 21.

> "it often is the case that what a complainant believes are the charges and what the actual charges are under APD's rubric and available evidence differ" and in such cases "OPS may identify a different policy concern *and decide to open the file for investigation of conduct outside the four corners of the citizen's original complaint.*

*Id.* ¶¶ 20, 21 (emphasis added).

In other words, in certain cases APD will investigate what it chooses to investigate, and not what the citizen complained about. The specific example given by Lieutenant Collins, regarding a citizen complaint of excessive force, exemplifies this very problem, and it is astounding:

> For instance, a citizen may make a complaint regarding "excessive force," but no physical force was used, or the force used to affect the arrest was within policy. Upon review, OPS may identify a different policy concern and decide to open the file for investigation of conduct outside the four corners of the citizen's original complaint, like the employee may have violated another portion of APD.SOP.3010 Use of Force due to reporting or notification requirements.

*Id.*

Under the City's approach, if a Complainant alleges excessive force and OPS determines that excessive force was not used, but discovers that the officer

committed a use of force *reporting* violation, OPS will investigate the reporting violation *rather* than the Complainant's actual complaint about excessive force and never report a finding on the actual complaint of excessive force.[8]

Lieutenant Collins's "logic" is circular to the extreme; she basically testified that if APD determines that no excessive force was used APD does not need to notify the complainant of that determination, because no excessive force was used. And she revealed that the City intends to *continue* to employ one of the very practices that brought us to this point, under which OPS chooses not to investigate the specific thing alleged by the Complainant (such as excessive force).

Beyond the problem of not investigating the citizen's actual complaint, the City intends to continue employing a notification policy that is not merely uninformative by misleading: the City intends to continue to notify Complainants *only* that an officer was disciplined for a "Conformance to Directives" violation *without* specifying the directive that the officer violated (e.g., the directive to *report* the use of force), leaving the Complainant guessing

---

[8]  Naturally, APD may sometimes identify some other misconduct or rule violation that was not complained about by the citizen, and it is certainly appropriate for APD to investigate those violations and impose discipline where appropriate.  However, that must be in addition to, and not instead of, investigating and adjudicating the actual complaint made by the Complainant.

whether discipline was imposed for something other than the Complainant's
actual allegation (e.g., the use of excessive force itself).

This is not an abstract or theoretical problem; it is one of the specific types
of non-compliance at the heart of this contempt proceeding. For example, the
Complainant's allegation of unlawful arrest in OPS File No. 22-C-0392-SOP was
never investigated; instead, OPS chose to investigate and adjudicate only the
officer's failure to report the Complainant's injuries to the officer's supervisor,
and then the Complainant was falsely informed that his complaint of unlawful
arrest ("the allegation stated in your complaint") had been sustained when in
fact APD disciplined the officer *only* for failing to notify his or her supervisor of
the Complainant's injuries. Other examples that were pointed out to the City in
Plaintiffs' Report are summarized in this footnote.[9]

---

[9] Other examples provided in Plaintiffs' Report to the Court (Doc. 515 at 24-26)
include:

OPS File No. 21-C-0481- SOP (in which a Complainant who alleged excessive
force was falsely led to believe that her complaint of excessive force had been
sustained and the officers disciplined for it when none of the officers were
investigated or disciplined for excessive force; they were investigated and
disciplined for technical SOP violations relating to Extra Job Permits and the use
of Body Worn Cameras)

OPS File No. 23-C-0131-SOP (where the Complainant was misled into believing
that her Use of Force complaint was sustained and the officer disciplined for
excessive force, when in fact the officer was never even investigated for the use
of force; the officer was investigated and disciplined *only* for failing to activate
his Body Worn Camera).

The City's intention to *continue* this non-compliant practice (as announced by OPS Lt. Collins) was demonstrated over the past few months as the City has, in fact, continued to follow the same practice *of not investigating the actual complaint made by the Complainan*t even months after the briefing and Orders in this contempt proceeding:

- OPS File 23-C-0549-SOP was opened in October, 2023. The Complainant had filed a Use of Force complaint on the APD website alleging that "Officer choked me out until I was unconscious with his crowbar. I then suffered a fractured, cricoid process and shoulder fracture as a result of his excessive force." APD opened an investigation *only* into whether the officer failed to activate his Body Worn Camera and failed to report the use of force to his superior, not the alleged use of force itself. Exhibit M.

- OPS File 23-C-0537-S0P was closed on December 14, 2023. The citizen had complained to the Atlanta Citizen Review Board that she had been unlawfully seized without RAS or Probable Cause. The ACRB investigated the allegation and recommended that APD *sustain* a finding of False Imprisonment, but APD investigated *only* whether the officer activated her Body Worn Camera. APD made no inquiry into whether the citizen had been falsely arrested, and informed the Complainant only about the disposition of the Body Worn Camera violation, with no mention of the unlawful seizure allegation. Exhibit N.

- OPS File 23-C-0603-S0P was closed on December 5, 2023. This Complainant also complained that she was unlawfully stopped without cause, yet again OPS investigated *only* whether the officer failed to activate her Body Worn Camera. The OPS investigation did not include any inquiry into whether the officer's seizure of the Complainant was lawful. The Complainant was notified only about the disposition of the Body Worn Camera issue (about which she had not complained and was in fact unaware) and was never informed about whether or how OPS resolved her actual complaint that she had been unlawfully seized. Exhibit O.

- OPS File 23-C-0663-SOP was opened on December 20, 2023. The Complainant had filed a Use of Force complaint on the APD website alleging that an officer threatened to shoot him, but APD decided to open

this file as an investigation *only* into whether the officer activated his Body Worn Camera. Exhibit P.

The only excuse offered by the City for its intention to continue this non-compliant practice is the complexity of the Atlanta Police Department's internal regulations, but in describing to the Court the complexity of APD's SOPs and Work Rules[10] the City is trying to make complex something that is quite simple. Yes, APD does indeed have more than 130 Work Rules and 170 SOPs, some of which are overlapping, as described by the City's Declarations, but the City's obligation under the Court's Orders is very simple: The City must investigate the complaint actually made by the Complainant (i.e., the Complainant's "expression of a wrong suffered, or grievance").

Nor is this an unimportant technicality. The Citizen Complaint requirement of the Court Order aligns with the very reason police departments around the nation conduct internal affairs investigations of complaints of alleged police misconduct. As this Court recognized: "In a police reform, of which the Consent Orders are type, it makes sense that such expressions of wrongs suffered by citizens at the hands of their police force should be remedied." 1/5/2018 Court Order (Doc. 401) at 12. If the City refuses, in some cases, to investigate the

---

[10]  See, Peek Decl., Doc. 523-1, ¶ 15; Collins Decl., Doc 523-2, ¶¶ 22)

specific "expressions of wrongs suffered" about which a citizen has complained, those wrongs, by definition, can never be remedied.

To be clear, APD's Work Rules and SOP's do play an essential role in whether or not a complaint is *sustained*. For example, it would be perfectly appropriate for APD to inform a Complainant, "You complained that an officer did xxxx to you, but doing xxxx does not violate any APD Work Rule or SOP and so your complaint is Unfounded." Such a disposition would be appropriate and in compliance with the *Calhoun* Court Order. But it is a violation of the Court Order for the City to take the position – as it proposes to continue doing – that because xxxx does not violate any specific APD *Work Rule* the City does not need to investigate or adjudicate the complaint of xxxx at all.[11]

---

[11] And with regard to Notification, little needs to change: the City can continue to impose discipline for a violation of the Conformance to Directives Work Rule, as it often prefers to do. All the Plaintiffs ask is that City be required to report "the underlying law, rule, or SOP" that was investigated so that a Complainant will be told *what* complaint was investigated and resolved. Plaintiffs' Report (Doc. 515) at 47-48. Moreover, the City *already identifies the underlying violation* when it investigates an officer for "Conformance to Directives." Indeed, it is not possible to determine if an officer conformed to a directive *without* identifying the directive.  It just needs to flag that directive to the complaining citizen in the Notification Letter already being sent. It is hard to see the City's position on this issue as anything other than defiance.

## IV.   CITIZEN COMPLAINTS ARE NOT ONLY AREA OF THE CITY'S NON-COMPLIANCE

While the City suggests that the rest of the requirements of the 2018 Court Order are satisfied, they know that many are not, and the sanctions imposed here should encourage the City to comply with *all* its obligations, both because that will benefit the people of Atlanta, and also to reduce the likelihood of additional contempt proceedings with regard to other areas of the *Calhoun* Order.

The City's Response tells the Court that "Of the seven components of required compliance in the 2018 Order, six never have required review or intervention by the Court." City Response (Doc. 523) at 23. The City is clearly suggesting that there are no other compliance issues and that, with the City's claimed steps toward compliance on Citizen Complaints, the books on *Calhoun* compliance should be closed. But the City knows that this claim is false. While Plaintiffs have chosen to take a one-step-at-a-time approach to the City's compliance deficiencies, rather than initiating a sprawling and onerously expensive omnibus contempt proceeding covering multiple topics, the City knows that there are other serious problems.

The City knows that its suggestion of a clean slate is false because compliance problems have repeatedly and conspicuously been brought to the

City's attention.[12] In addition to the numerous memos, emails, and conferences over the past five years, in which Plaintiffs have provided the City with specific evidence and information about non-compliance with areas other than Citizen Complaints (some of which will be discussed below), Plaintiffs' August 2022 contempt motion regarding Citizen Complaints itself clearly advised the City and the Court that the City was *also* failing to comply to comply with the Stop & Think requirement: "Plaintiffs would also like to advise the Court that there have also been serious and continuing issues of the City's non-compliance with the Stop & Think requirements of Section IV the Court Order." Plaintiffs' 8/14/2022 Motion for Order and/or for Contempt (Doc. 473), fn 40 at 23-24.

Plaintiffs stress that they are not now seeking contempt for non-compliance with the Stop & Think requirements. Should that be necessary, Plaintiffs will present an appropriate motion. For the purposes of this motion for sanctions, the Plaintiffs provide the following snapshot of non-compliance with Stop and Think so that the Court can understand that broader non-compliance

---

[12] Plaintiffs want to express their belief, however, that while the City itself certainly knows of these problems, the City's new outside counsel were personally unaware of the seriousness of these compliance deficiencies when they signed their names to the arguments presented in Defendants Response to Plaintiffs' Report to the Court (Doc. 523).

issues should be considered when fashioning the Court's determination of sanctions for Citizen Complaints.

### A.     Stop and Think Non-Compliance

The most significant area in which the City is not now – and has never been – in compliance with the 2018 Court Order is the Stop & Think requirements of the 2018 Court Order, which are perhaps the requirements most closely tailored to prevent a recurrence of the unlawful conduct from which this case arose: the unreasonable warrantless search or seizure of persons who are present in an establishment without *individualized* Reasonable Articulable Suspicion or Probable Cause. (The idea behind the Stop and Think obligation is that if an officer knows that he or she will be required to record – on a "Stop and Think Form" – the *reason* for the warrantless search or seizure of a particular person inside an establishment, the officer will be prompted to stop and think before conducting the search or seizure.)

From the very beginning of the period following the November 29, 2018 Court Order – during 2019, 2020, 2021, 2022, and through the present – Plaintiffs have repeatedly presented evidence to the City documenting the failure of APD officers to complete Stop & Think Forms when required and information indicating that the vast majority of APD officers appear not to understand the Stop & Think requirement:

29

- Plaintiffs' Compliance Memo for the month of February 2019 provided evidence of officers' failure to complete Stop & Think Forms as required and expressed Plaintiffs' "hope that the City will take more effective steps to promote future compliance with the Stop & Think Form requirements." Exhibit A, Plaintiffs' 4/12/2019 Compliance Memo to City of Atlanta, pp. 4-6

- Plaintiffs' Compliance Memo for the month of March 2019 contained twelve pages of details regarding officers' continuing failure to complete Stop & Think Forms correctly and when required, including references to specific incidents in which a form was required but not completed, and expressed Plaintiffs' concern about the City's "failure of effective supervision to encourage and require officers to complete Forms accurately and meaningfully." Exhibit B, Plaintiffs' 4/23/2019 Compliance Memo to City of Atlanta, pp. 14-25.

- Plaintiffs' Compliance Memo for the month of April 2019 included eight pages summarizing evidence of the "broad failure of Atlanta police officers to document Stop and Think encounters as required by the Court Order" and notified the City that "It seems apparent from the foregoing that the City has not taken effective measures with regard to training and supervision to ensure that officers are faithfully complying with the Stop and Think requirement." Exhibit C, Plaintiffs' 5/29/2019 Compliance Memo to City of Atlanta, pp. 2-9.

- Plaintiffs' letter to the City on October 23, 2020 presented evidence regarding the failure of officers to complete Stop & Think Forms and noted (among other compliance problems relating to Training, Citizen Complains, and Officer Identification) that "encounters requiring Stop and Think Forms are not being documented as required, [suggesting] a failure of effective supervision to encourage and require officers to complete Forms when required." Exhibit G, 10/23/2020 Letter from Clayton Skinner to Joseph Siegelman, pp. 2-3.

- In March 2021 the Plaintiffs sent the City evidence of continued non-compliance, noting that this evidence reflected "a very concerning and substantial failure of APD officers to complete Stop & Think Forms for each encounter where a Form is required, which is a problem Plaintiffs' counsel have brought to the City's attention time and again during the past two years." Exhibit Q, Plaintiffs' 3/5/2021 Compliance Memo to City of Atlanta, pp. 1-4.

- In April 2021 the Plaintiffs again presented the City with specific evidence documenting "a substantial failure of APD officers to complete Stop & Think Forms for each encounter where a Form is required." Exhibit H, Plaintiffs' 4/1/2021 Compliance Memo to City of Atlanta, pp. 1-5.

- In August 2021 the Plaintiffs sent the City a detailed Memo about the City's failure to take specific steps to improve Stop and Think compliance. Exhibit R, Plaintiffs' 8/30/2021 Memo to City Counsel.

- On July 13, 2022 the Plaintiffs sent the City a seven-page memo detailing specific instances of non-compliance, mentioning by incident number at least 79 encounters during March and April, 2022 that seemed to require a Stop & Think Form but for which no Form was created. Exhibit S, Plaintiffs' 7/13/2022 Compliance Memo to City of Atlanta.

Despite repeated warnings, officers are *still* not completing Stop and Think Forms as required even now. A spot check analysis by Plaintiffs of three months during 2023 – April, May, and November – revealed continuing widespread failure of officers to document Stop and Think encounters as required, including numerous encounters in which officers detained individuals inside places of business (as occurred during the "Eagle Raid" from which this case arose).[13] Based on the review of only a very limited subset of information about APD incidents, Plaintiffs identified at least 32 encounters during the month of November 2023 alone that seem likely to have also required creation of a Stop and Think Form, but for which no such form was created.[14]

---

[13] 1/25/2024 Memo from Plaintiffs' Counsel to City Counsel, Exhibit T, p. 3.

[14] *Id.*, p. 6.

These are not mere paperwork violations. To the contrary, some of the unreported encounters have similarities to the unlawful Eagle police raid. For example, APD Incident 231091730 involved the detention of multiple individuals at a business open to the public but no Stop and Think Forms were completed for any of the individuals who were detained except the one who was taken to jail; there is therefore no way to know if the officer had individualized suspicion to seize any of the other persons who were detained.[15] Far more importantly, the officer may not have felt the need to "stop and think" before seizing those other individuals – which defeats the very purpose of the Stop and Think requirement – because the City has done almost nothing to impress upon officers the need to complete Stop and Think Forms.

Over a period of years the Plaintiffs suggested ways for the City to determine the reasons officers were failing to comply with the Stop & Think requirement, so these reasons could be addressed, and Plaintiffs have encouraged the City to employ the three mechanisms universally used by police departments to encourage and enforce compliance with departmental regulations: training, supervision, and discipline. Specifically:

- Plaintiffs encouraged the City to have supervisors talk to police officers who had not completed required Stop & Think Forms to determine *why*

---

[15] Exhibit T, Plaintiffs' 1/25/2024 Memo to City Counsel, p. 3; Exhibit U, Incident Report 231091730

officers were not completing the Forms, so the City could determine what steps might be needed to remedy this deficiency;

- Plaintiffs encouraged the City to "provide specialized training to supervisors regarding how they should monitor Stop & Think compliance (by reviewing all incident reports, and not just encounters for which a Stop & Think Form was actually created)"; and

- Plaintiffs encouraged the City to have supervisors counsel officers under their command about Stop and Think compliance.[16]

Over a year later, Plaintiffs took 30(b)(6) depositions to inquire if any of these steps had been taken by the City during the previous year. According to the City's 30(b)(6) representative, *the City had done none of these things*:

Q: …the City of Atlanta has never trained or instructed or asked supervisors to interview officers about why they didn't fill out a Stop & Think form; is correct?

A: In terms of training them on how to do so, that's correct.

Q: Right. So the City has never suggested, instructed or trained supervisors to interview an officer about why he or she didn't fill out a Stop & Think form?

A: They haven't trained them on how to -- how to -- how to address the Stop & Think form issues.

Q: Have they ever instructed them about how -- about interviewing officers to see why an officer didn't fill out a Stop & Think form?

---

[16] Plaintiffs made these suggestions several times, including in a phone conference on July 7, 2021, which was summarized in a July 29, 2021 email from Plaintiffs' counsel Clayton Skinner to City counsel Joseph Siegelman (Exhibit V), and Plaintiffs expanded on these topics and made specific suggestions regarding ways supervisors could encourage officers to comply with the Stop & Think requirement in a twelve page Memo to the City of Atlanta on August 30, 2021. Exhibit R.

A: I don't believe they have, no.

9/19/2022 Deposition of APD Lt. Jason Foore, p. 26, line 23 – p. 27, line 14

Q: … Has the City ever provided specialized training to supervisors about how they should monitor Stop & Think compliance?

A They have not.

Id., p. 28, lines 22-25.

Q: … So the City of Atlanta has never instructed supervisors to review all incident reports to determine if a Stop & Think form should have been created?

A: I believe that's correct, yes.

Id., p. 42, lines 2-6.

In addition to taking no steps to determine *why* officers were not completing Stop & Think Forms, the City also took no steps toward having supervisors counsel officers about compliance, nor did the City use its disciplinary power to encourage officers to complete Stop & Think Forms when required. During the two-year period covered by Plaintiffs' 7/27/2022 discovery request, *in only one single instance* did a supervisor ever counsel an officer who failed to complete a required Stop & Think Form about the need to comply with the regulation.[17]

---

[17] Exhibit W, City of Atlanta's Response to Plaintiffs' Request for Production, Request 2 and attached document Bates # 000001.  (Exhibit 2 to Foore deposition)

Nor has the APD used its disciplinary power to encourage officers to complete Stop & Think Forms when required. In all the OPS records produced by the City of Atlanta over the past twelve years no officer was disciplined for failing to complete a Stop & Think Form.  Indeed the City's September 14, 2022 discovery response indicated that not a single instance of discipline was imposed for the failure to comply with the Stop & Think requirement over the preceding two years, and the City's counsel admitted on the record at the 30(b)(6) deposition on September 19, 2022 that no discipline had ever been imposed for failing to complete a required Stop & Think Form in the two years between August 2020 and the date of the deposition.[18] Nor have later OPS documents provided by the City between the date of that deposition and the present included a single instance of an officer being counseled, admonished, reprimanded, or disciplined in any way for failing to complete a required Stop and Think Form.

## V.    EXTENSION OF MONITORING SUNSET

At the time Plaintiffs consented to the 2018 Order, Plaintiffs believed that six years would be long enough for the City both to accept the need to begin complying with the obligations originally established in 2010 and also to develop procedures and mechanisms to implement such compliance, and so Plaintiffs

---

[18] Id. ¶ 1;  Depo. Of Jason Foore, p. 45 line 21 – p. 46 line 1.

agreed that the required disclosures and monitoring procedures in the 2018
Court Order could be allowed to sunset after six years.

But while the monitoring provisions under the terms of the 2018 Order are
set to expire in November of this year, the City has not used the past five years to
develop either the desire to comply *or* the procedures required to do so; instead,
the City's approach to compliance over the past five years clearly suggests that
the City should not be trusted to comply with the Court's Orders simply on its
own volition without being monitored, and so Plaintiffs ask the Court to extend
these monitoring provisions for a period of three years, at the end of which the
City's compliance – and therefore the need for continued monitoring – can be re-
evaluated.

### A.   The Burden and Cost of Monitoring Will be Minimal if the City Chooses to Comply with the Order

The only argument against extending monitoring is the administrative
burden of the monitoring requirements upon the City and the cost of the process
in terms of Plaintiffs' attorney fees, but both of these will be minimal if the City
chooses to comply with its obligations.[19]

---

[19] It must be remembered that the cost of *compliance itself* will not change, since
City's obligation to comply with the substantive provisions of the Court's Order
will continue unchanged; it is only the monitoring mechanisms that come to an
end under the sunset provisions of the November 29, 2018 Court Order.

The burden of the monitoring mechanisms themselves is relatively minimal. With regard to Citizen Complaints, for example, the City simply needs to scan a handful of OPS files each month and produce a monthly spreadsheet summarizing them. According to the City, APD received 428 Citizen complaints between 2020 and 2022 , or an average of 11.89 per month. City Response (Doc. 523) at 22. Scanning and summarizing 12 complaints per month is simply not onerous, and the only reason that obligation may have seemed burdensome in past is because the City allowed hundreds of year-old complaints to pile up in a backlog. Given the small number of Citizen Complaints received by the APD, the burden of producing copies of files and creating a monthly spreadsheet will become trivial once the City consistently begins closing Citizen Complaints within 180 days.

Plaintiffs' attorney fees will also be minimal if the City complies with the Order and Plaintiffs need simply to spot-check compliance – and if the City refrains from the addiction to litigation it has shown in the past– since the Plaintiffs' attorney fees over the past years have almost entirely been the result of the City's choice to struggle *against* compliance, requiring the Plaintiffs to devote time and attention to discovering and documenting non-compliance, and responding to the City's consistently adversarial and litigious approach. As a perfect example, this entire contempt proceeding itself would have been unnecessary if the City had complied with the Citizen Complaint requirements

37

when Plaintiffs asked them to do so in 2019, 2020, 2021, and early 2022. As an example, well over $100,000 of attorney fee expense would have been avoided if the City had come into compliance after Plaintiffs filed their August 14, 2022 Motion for Contempt (Doc. 473) rather than choosing to defend conduct that even its new outside counsel now accurately describes as indefensible.[20] And as discussed above, over a million dollars of attorney fees were spent on a Special Master process that the City first insisted upon and then later opposed when the Special Master found the City was failing to comply with the Order, prompting the City to engage in still further litigation to remove the Special Master.

If, instead of resisting compliance and then engaging in wasteful litigation when caught, the City were simply to comply with the Court's Orders, with Plaintiffs merely spot-checking compliance, with no need to spend time documenting instances of non-compliance, filing motions with the Court, and then replying to the City's denials, monitoring would be a streamlined and inexpensive process. And to the extent the City *has* suddenly become genuinely concerned about the cost of Plaintiffs' attorney fees, the prospect of having to pay those fees may serve as a salutary deterrent; the more the City complies, the lower the fees the City will have to pay for monitoring.

---

[20]  City Response (Doc. 523) at 2, 10, 12-13.

**B.     Extending the sunset is necessary to achieve the results promised by the settlement**

While the burden and cost of extending the sunset is minimal, the risk of not extending it is great. Given the City's attitude toward compliance, the risk of backsliding, even in areas in which the City has made improvements, is high. As just one example, as the result of years of intensive efforts by Plaintiffs since 2018 the City has made great progress in ensuring that APD officers wear conspicuously visible nametags as required by the Calhoun orders, but in light of the City's demonstrated hostility to Calhoun compliance the Plaintiffs worry that without oversight this may backslide as new uniforms replace old ones, as new APD units are developed and outfitted, and as new officers join the police department and receive equipment for the first time.  And the areas of drastic non-compliance, such as known problems with Stop and Think, as well as significant issues with Training, must still be addressed by the City.

While the burden and expense on the City of the monitoring mechanisms in the 2018 Court Order is small – assuming the City chooses to begin complying with its obligations – the risk of not extending the monitoring sunset includes the potential loss of reforms that (A) benefit the residents of Atlanta and the APD itself; (B) were bargained for in 2010 by Plaintiffs, who compromised financial benefits in return for these reforms; and (C) have been the focus of twelve years of effort by Plaintiffs, a Special Master, and this Court.  It would be a shame to

allow these benefits and all the time, effort, and expense that has been undertaken over the past twelve years to go to waste if compliance is allowed to wither.

## VI.   CONCLUSION

It is undeniably painful to think of a city paying a multi-million-dollar sanction. But there are two larger principles. One is that the reforms Plaintiffs seek to enforce benefit the residents of Atlanta and the police department itself. The Plaintiffs in this action did not obtain any personal or selfish benefit in agreeing to a settlement in which they traded personal financial gain for reforms that benefit the public, and it is the public that benefits when these reforms are upheld. When a police department takes citizen complaints seriously, investigates them, and resolves them promptly, it builds public confidence in law enforcement, which benefits both the public and its police force; when police officers wear nametags and allow the public to video them, so the public feels their police officers are accountable, it builds public confidence in law enforcement, which benefits both the public and its police force; and when police officers are made to "stop and think" before detaining or arresting or searching members of the public, it builds public confidence in law enforcement, which benefits both the public and its police force.

And if there is any institution in our society that should be a role model for law and order, it is a police department. When a federal court orders a police

department to do something, the public should know that their police department will comply.  If they fail, the concept that we are a nation of laws is compromised, and the public's faith in our justice system is weakened.

As Margaret Thatcher once said about a government policy, "the medicine is harsh, but the patient requires it." The medicine of sanctions is harsh, but unfortunately it has become clear that the City of Atlanta requires it.


Respectfully submitted this 12th day of February 2024.[21]

ATTORNEYS FOR PLAINTIFFS

Daniel J. Grossman
GA State Bar No. 313815
Law Office of Daniel J. Grossman
5101 Old Highway 5, #701
Lebanon, GA 30146
Telephone: (404) 654-0326
Email: Dan@DanGrossmanLaw.com

Gerald R. Weber, Jr.
GA State Bar No. 744878
Southern Center for Human Rights
60 Walton St. NW
Atlanta, GA 30303-2149
Telephone: ( (404) 688-1202
Email: gweber@schr.org

---

[21] Counsel hereby certifies that this Reply Brief is filed in Book Antiqua, 13-point type.

Gregory R. Nevins
GA State Bar No. 539529
Lambda Legal Defense & Education Fund, Inc.
730 Peachtree St. NE
Atlanta, GA 30308
Telephone: (404) 897-1880
Email:  GNevins@lambdalegal.org

Clayton Skinner
GA State Bar No. 360849
The Skinner Law Firm
P.O. Box 750773
Atlanta, GA 30357
Telephone: (706) 215-5006
Email:  clay@vpsouth.com

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| GEOFFREY CALHOUN, et al. | ) |
|  | ) |
|  | ) |
| Plaintifs, | ) |
|  | ) Civil Action |
| v. | ) File No. 1:09-CV-3286-TCB |
|  | ) |
|  | ) |
| RICHARD PENNINGTON, et al. | ) |
|  | ) |
| Defendants. | ) |

## CERTIFICATE OF SERVICE

I here by certify that I have this day electronically submitted the foregoing **(CORRECTED AND SUBSTITUTED) PLAINTIFFS' REPLY TO DOC. 523 (DEFENDANT'S RESPONSE TO PLAINTIFFS' REPORT TO THE COURT RE CITIZEN COMPLAINT SANCTIONS)** to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to counsel of record who are on CM/ECF.

So certified this 12th day of February 2024.

By:   Daniel J. Grossman
GA State Bar No. 313815
Law Office of Daniel J. Grossman
5101 Old Highway 5, #701
Lebanon, GA 30146
Telephone: (404) 654-0326
Email: Dan@DanGrossmanLaw.com